# DORR v. UNITED STATES.

## ERROR TO THE SUPREME COURT OF THE PHILIPPINE ISLANDS.

No. 583. Argued April 22, 1904.—Decided May 31, 1904.

While it is settled that the Constitution of the United States is the only source of power authorizing action by any branch of the Federal Government, it is equally well settled that the United States may acquire territory in the exercise of the treaty-making power by direct cession as the result of war, and in making effective terms of peace and for that purpose has the powers of other sovereign nations.

Congress has the right to make laws for the government of Territories, without being subject to all the restrictions which are imposed upon it when passing laws for the United States considered as a political body of States in union and, until territory ceded by treaty has been incorporated into the United States, it is to be governed under Congress subject only to such constitutional restrictions upon its powers as are applicable to the situation.

It is evident, from Article IX of the treaty with Spain ceding the Philippine Islands, that the intention of the framers of the treaty was to reserve to Congress, so far as it could constitutionally be done, a free hand in dealing with the territory ceded by the treaty.

Congress has not up to the present time incorporated the Philippine Islands into the United States, and by an express provision of the act of July 1, 1902, § 1891, Rev. Stat., by which force and effect is given to the Constitution and laws of the United States in the Territories, does not apply to the Philippine Islands.

The power to govern territory implied in the right to acquire it, and given to Congress in Article IV, § 3 of the Constitution, to whatever other limitations it may be subject, does not require Congress to exact for ceded territory, not made a part of the United States by Congressional action, a system of laws which shall include the right of trial by jury, and the Constitution does not, without legislation and of its own force, carry such right to territory so situated.

Under §§ 7 and 8 of the libel law enacted by the Philippine Commission, permitting a fair and true report of judicial, legislative and public official proceedings as privileged communications but excluding libelous remarks or comments from the privilege, the headlines "Traitor, Seducer, Perjurer—Wife would have killed him," over the report of a trial, although in quotation marks, are not within the privilege given by the act, and, if proved to be without basis, are libelous.

The power of Congress to authorize the temporary government, such as

that established under the Spooner Resolution of March 2, 1901, for the Philippine Islands, has been frequently exercised and is not now open to question, and the Philippine Commission established under that act had power to enact the libel law involved in this case.

THE facts, which involved the question whether in the absence of a statute of Congress expressly conferring the right of trial by jury, when demanded by the accused, is a necessary incident of judicial procedure in the Philippine Islands, are stated in the opinion of the court.

No brief filed for plaintiff in error.

*Mr. L. R. Wilfley*, Attorney General for the Philippine Islands and *Mr. Solicitor General Hoyt*, for the United States.[1]

MR. JUSTICE DAY delivered the opinion of the court.

This case presents the question whether, in the absence of a statute of Congress expressly conferring the right, trial by jury is a necessary incident of judicial procedure in the Philippine Islands, where demand for trial by that method has been made by the accused and denied by the courts established in the islands.

The recent consideration by this court and the full discussion had in the opinions delivered in the so-called "*Insular cases*," renders superfluous any attempt to reconsider the constitutional relation of the powers of the government to territory acquired by a treaty cession to the United States. *De Lima* v. *Bidwell*, 182 U. S. 1; *Downes* v. *Bidwell*, 182 U. S. 244. The opinions rendered in those cases cover every phase of the question, either legal or historical, and it would be useless to undertake to add to the elaborate consideration of the subject had therein. In the still more recent case of *Hawaii* v. *Mankichi*, 190 U. S. 197, the right to a jury trial in outlying

[1] This case was argued simultaneously with *Kepner* v. *United States.* For abstracts of arguments, see *ante*, p. 100.

territory of the United States was under consideration. For the present purpose it is only necessary to state certain conclusions which are deemed to be established by prior adjudications, and are decisive of this case.

It may be regarded as settled that the Constitution of the United States is the only source of power authorizing action by any branch of the Federal Government. "The Government of the United States was born of the Constitution, and all powers which it enjoys or may exercise must be either derived expressly or by implication from that instrument." *Downes* v. *Bidwell,* 182 U. S. 244, 288, and cases cited. It is equally well settled that the United States may acquire territory in the exercise of the treaty-making power by direct cession as the result of war, and in making effectual the terms of peace; and for that purpose has the powers of other sovereign nations. This principle has been recognized by this court from its earliest decisions. The convention which framed the Constitution of the United States, in view of the territory already possessed and the possibility of acquiring more, inserted in that instrument, in article IV, section 3, a grant of express power to Congress "to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States."

As early as the February term, 1810, of this court, in the case of *Seré and Laralde* v. *Pitot and others,* 6 Cranch, 332, Chief Justice Marshall, delivering the opinion of the court, said:

"The power of governing and legislating for a territory is the inevitable consequence of the right to acquire and to hold territory. Could this position be contested, the Constitution of the United States declares that 'Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States.' Accordingly we find Congress possessing and exercising the absolute and undisputed power of governing and legislating for the Territory of Orleans. Congress has

given them a legislative, an executive and a judiciary, with such powers as it has been their will to assign to those departments respectively."

And later, the same eminent judge, delivering the opinion of the court in the leading case upon the subject, *American Insurance Co.* v. *Canter,* 1 Pet. 511, 542, says:

"The Constitution confers absolutely on the government of the Union the powers of making war and of making treaties; consequently that government possesses the power of acquiring territory, either by conquest or by treaty. The usage of the word is, if a nation be not entirely subdued, to consider the holding of conquered territory as a mere military occupation, until its fate shall be determined at the treaty of peace. If it be ceded by the treaty, the acquisition is confirmed, and the ceded territory becomes a part of the nation to which it is annexed, either on the terms stipulated in the treaty of cession, or on such as its new master shall impose. On such transfer of territory it has never been held that the relations of the inhabitants with each other undergo any change. Their relations with their former sovereign are dissolved and new relations are created between them and the government which has acquired their territory. The same act which transfers their country transfers the allegiance of those who remain in it; and the law, which may be denominated political, is necessarily changed, although that which regulates the intercourse and general conduct of individuals remains in force until altered by the newly created power of the State.

"On the 2d of February, 1819, Spain ceded Florida to the United States. The sixth article of the treaty of cession contains the following provision: 'The inhabitants of the territories, which his Catholic Majesty cedes to the United States by this treaty, shall be incorporated in the Union of the United States as soon as may be consistent with the principles of the Federal Constitution, and admitted to the enjoyment of the privileges, rights and immunities of the citizens of the United States.'

"This treaty is the law of the land, and admits the inhabitants of Florida to the enjoyment of the privileges, rights and immunities of the citizens of the United States. It is unnecessary to inquire whether this is not their condition, independent of stipulation. They do not, however, participate in political power; they do not share in the government till Florida shall become a State. In the meantime Florida continues to be a territory of the United States, governed by virtue of that clause in the Constitution which empowers Congress 'to make all needful rules and regulations respecting the territory or other property belonging to the United States.'"

While these cases, and others which are cited in the late case of *Downes* v. *Bidwell, supra,* sustain the right of Congress to make laws for the government of territories, without being subject to all the restrictions which are imposed upon that body when passing laws for the United States, considered as a political body of States in union, the exercise of the power expressly granted to govern the territories is not without limitations. Speaking of this power, Mr. Justice Curtis, in the case of *Scott* v. *Sandford,* 19 How. 393, 614, said:

"If, then, this clause does contain a power to legislate respecting the territory, what are the limits of that power?

"To this I answer that, in common with all the other legislative powers of Congress, it finds limits in the express prohibitions on Congress not to do certain things; that, in the exercise of the legislative power, Congress cannot pass an *ex post facto* law or bill of attainder; and so in respect to each of the other prohibitions contained in the Constitution."

In every case where Congress undertakes to legislate in the exercise of the power conferred by the Constitution, the question may arise as to how far the exercise of the power is limited by the "prohibitions" of that instrument. The limitations which are to be applied in any given case involving territorial government must depend upon the relation of the particular territory to the United States, concerning which Congress is exercising the power conferred by the Constitution. That

the United States may have territory, which is not incorporated into the United States as a body politic, we think was recognized by the framers of the Constitution in enacting the article already considered, giving power over the territories, and is sanctioned by the opinions of the justices concurring in the judgment in *Downes* v. *Bidwell, supra.*

Until Congress shall see fit to incorporate territory ceded by treaty into the United States, we regard it as settled by that decision that the territory is to be governed under the power existing in Congress to make laws for such territories and subject to such constitutional restrictions upon the powers of that body as are applicable to the situation.

For this case, the practical question is, must Congress, in establishing a system for trial of crimes and offenses committed in the Philippine Islands, carry to their people by proper affirmative legislation a system of trial by jury?

If the treaty-making power could incorporate territory into the United States without Congressional action, it is apparent that the treaty with Spain, ceding the Philippines to the United States, carefully refrained from so doing; for it is expressly provided that (Article IX) "the civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress." In this language it is clear that it was the intention of the framers of the treaty to reserve to Congress, so far as it could be constitutionally done, a free hand in dealing with these newly-acquired possessions.

The legislation upon the subject shows that not only has Congress hitherto refrained from incorporating the Philippines into the United States, but in the act of 1902, providing for temporary civil government, 32 Stat. 691, there is express provision that section eighteen hundred and ninety-one of the Revised Statutes of 1878 shall not apply to the Philippine Islands. This is the section giving force and effect to the Constitution and laws of the United States, not locally inapplicable, within all the organized territories, and every

territory thereafter organized, as elsewhere within the United States.

The requirements of the Constitution as to a jury are found in article III, section 2:

"The trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the States' where such crimes shall have been committed; but when not committed within any State, the trial shall be at such place or places as the Congress may by law have directed."

And in article six of the amendments to the Constitution:

"In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury, of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence."

It was said in the *Mankichi* case, *supra*, that when the territory had not been incorporated into the United States these requirements were not limitations upon the power of Congress in providing a government for territory in execution of the powers conferred upon Congress. Opinion of Mr. Justice White, p. 220, citing *Hurtado* v. *California*, 110 U. S. 516; *In re Ross*, 140 U. S. 453, 473; *Bolln* v. *Nebraska*, 176 U. S. 83, and cases cited on page 86; *Maxwell* v. *Dow*, 176 U. S. 581, 584; *Downes* v. *Bidwell*, 182 U. S. 244.

In the same case Mr. Justice Brown, in the course of his opinion, said:

"We would even go farther, and say that most, if not all, the privileges and immunities contained in the bill of rights of the Constitution were intended to apply from the moment of annexation; but we place our decision of this case upon the ground that the two rights alleged to be violated in this case [right to trial by jury and presentment by grand jury] are not fundamental in their nature, but concern merely a method

of procedure which sixty years of practice had shown to be suited to the conditions of the islands, and well calculated to conserve the rights of their citizens to their lives, their property and their well being."

As we have had occasion to see in the case of *Kepner* v. *United States,* decided, *ante,* p. 100, the President, in his instructions to the Philippine Commission, while impressing the necessity of carrying into the new government the guarantees of the Bill of Rights securing those safeguards to life and liberty which are deemed essential to our government, was careful to reserve the right to trial by jury, which was doubtless due to the fact that the civilized portion of the islands had a system of jurisprudence founded upon the civil law, and the uncivilized parts of the archipelago were wholly unfitted to exercise the right of trial by jury. The Spanish system, in force in the Philippines, gave the right to the accused to be tried before judges, who acted in effect as a court of inquiry and whose judgments were not final until passed in review before the audiencia or Supreme Court, with right of final review and power to grant a new trial for errors of law in the Supreme Court at Madrid. To this system the Philippine Commission, in executing the power conferred by the orders of the President and sanctioned by act of Congress, act of July 1, 1902, 32 Stat. 691, has added a guaranty of the right of the accused to be heard by himself and counsel, to demand the nature and cause of the accusation against him, to have a speedy and public trial, to meet the witnesses against him face to face, and to have compulsory process to compel the attendance of witnesses in his behalf. And, further, that no person shall be held to answer for a criminal offense without due process of law, nor be put twice in jeopardy of punishment for the same offense, nor be compelled in any criminal case to be a witness against himself. As appears in the *Kepner* case, *supra,* the accused is given the right of appeal from the judgment of the court of first instance to the Supreme Court, and, in capital cases, the case goes to the latter court without appeal.

It cannot be successfully maintained that this system does not give an adequate and efficient method of protecting the rights of the accused as well as executing the criminal law by judicial proceedings, which give full opportunity to be heard by competent tribunals before judgment can be pronounced. Of course, it is a complete answer to this suggestion to say, if such be the fact, that the constitutional requirements as to a jury trial, either of their own force or as limitations upon the power of Congress in setting up a government, must control in all the territory, whether incorporated or not, of the United States. But is this a reasonable interpretation of the power conferred upon Congress to make rules and regulations for the territories?

The cases cited have firmly established the power of the United States, like other sovereign nations, to acquire, by the methods known to civilized people, additional territory. The framers of the Constitution, recognizing the possibility of future extension by acquiring territory outside the States, did not leave to implication alone the power to govern and control territory owned or to be acquired, but in the article quoted expressly conferred the needful powers to make regulations. Regulations in this sense must mean laws, for, as well as States, territories must be governed by laws. The limitations of this power were suggested by Mr. Justice Curtis in the *Dred Scott* case, above quoted, and Mr. Justice Bradley, in the *Mormon Church Case*, 136 U. S. 1, said:

"Doubtless Congress in legislating for the Territories would be subject to those fundamental limitations in favor of personal rights which are formulated in the Constitution and its amendments; but these limitations would exist rather by inference and the general spirit of the Constitution from which Congress derives all its powers, than by any express and direct application of its provisions."

This language was quoted with approbation by Mr. Justice Brown in *Downes* v. *Bidwell, supra,* and in the same case Mr. Justice White said:

"Whilst, therefore, there is no express or implied limitation on Congress in exercising its power to create local governments for any and all of the Territories, by which that body is restrained from the widest latitude of discretion, it does not follow that there may not be inherent, although unexpressed, principles which are the basis of all free government which cannot be with impunity transcended. But this does not suggest that every express limitation of the Constitution which is applicable has not force, but only signifies that even in cases where there is no direct command of the Constitution which applies, there may nevertheless be restrictions of so fundamental a nature that they cannot be transgressed, although not expressed in so many words in the Constitution."

In treating of article 4, section 3, Judge Cooley, in his work on Constitutional Law, says:

"The peculiar wording of the provision [section 3, article 4] has led some persons to suppose that it was intended Congress should exercise, in respect to the territory, the rights only of a proprietor of property, and that the people of the territories were to be left at liberty to institute governments for themselves. It is no doubt most consistent with the general theory of republican institutions that the people everywhere should be allowed self-government; but it has never been deemed a matter of right that a local community should be suffered to lay the foundations of institutions, and erect a structure of government thereon, without the guidance and restraint of a superior authority. Even in the older States, where society is most homogeneous and has fewest of the elements of disquiet and disorder, the State reserves to itself the right to shape municipal institutions; and towns and cities are only formed under its directions, and according to the rules and within the limits the State prescribes. With still less reason could the settlers in new territories be suffered to exercise sovereign powers. The practice of the Government, originating before the adoption of the Constitution, has been for Congress to establish governments for the territories; and

whether the jurisdiction over the district has been acquired by grant from the States, or by treaty with a foreign power, Congress has unquestionably full power to govern it, and the people, except as Congress shall provide for, are not of right entitled to participate in political authority, until the Territory becomes a State. Meantime they are in a condition of temporary pupilage and dependence; and while Congress will be expected to recognize the principle of self-government to such extent as may seem wise, its discretion alone can constitute the measure by which the participation of the people can be determined." Cooley, Principles of Constitutional Law, 164.

If the right to trial by jury were a fundamental right which goes wherever the jurisdiction of the United States extends, or if Congress, in framing laws for outlying territory belonging to the United States, was obliged to establish that system by affirmative legislation, it would follow that, no matter what the needs or capacities of the people, trial by jury, and in no other way, must be forthwith established, although the result may be to work injustice and provoke disturbance rather than to aid the orderly administration of justice. If the United States, impelled by its duty or advantage, shall acquire territory peopled by savages, and of which it may dispose or not hold for ultimate admission to Statehood, if this doctrine is sound, it must establish there the trial by jury. To state such a proposition demonstrates the impossibility of carrying it into practice. Again, if the United States shall acquire by treaty the cession of territory having an established system of jurisprudence, where jury trials are unknown, but a method of fair and orderly trial prevails under an acceptable and long-established code, the preference of the people must be disregarded, their established customs ignored and they themselves coerced to accept, in advance of incorporation into the United States, a system of trial unknown to them and unsuited to their needs. We do not think it was intended, in giving power to Congress to make regulations for the territories, to hamper its exercise with this condition.

We conclude that the power to govern territory, implied in the right to acquire it, and given to Congress in the Constitution in Article IV, § 3, to whatever other limitations it may be subject, the extent of which must be decided as questions arise, does not require that body to enact for ceded territory, not made a part of the United States by Congressional action, a system of laws which shall include the right of trial by jury, and that the Constitution does not, without legislation and of · its own force, carry such right to territory so situated.

Other assignments of error bring further questions before the court which we will proceed to notice. The case was a · prosecution for libel brought at the instance of Don Benito Legarda, a member of the Philippine Commission, against the plaintiffs in error, Dorr and O'Brien, who were proprietors and editors of a newspaper published in the city of Manila, known as the "Manila Freedom." It appears that Legarda was the prosecuting witness against one Valdez, editor of a certain Spanish newspaper called the "Miau." At the time of the trial of Valdez, under the Spanish law then in force in the islands, the truth could not be given in defence in a prosecution for criminal libel. Notwithstanding this fact, counsel for Valdez, in the form of an offer of proof, read a paper in court, making certain statements with reference to the libel charged tending to show the truth thereof. In what purported to be a report of the proceeding, the Manila Freedom printed an article containing the matter set forth in the offer to prove, with headlines in large type, as follows:

·TRAITOR, SEDUCER, AND PERJURER.
SENSATIONAL ALLEGATIONS AGAINST COMMIS-
SIONER LEGARDA.
MADE OF RECORD AND READ IN ENGLISH— ·.
SPANISH READING WAIVED.
WIFE WOULD HAVE KILLED HIM.
LEGARDA PALE AND NERVOUS."

The prosecution of the plaintiffs in error was based upon the

publication of these headlines, which were charged to be a false and malicious libel printed in the English language of and concerning Don Benito Legarda. . At the time Valdez was tried, in which case the occurrence undertaken to be reported took place, the Spanish law was in force, denying the right to put in evidence the truth of the alleged libelous matter. At the time of the trial of the plaintiffs in error the Philippine Commission had passed Act No. 277, known as the libel law: ·

[No. 277.]

"An Act defining the law of libel and threats to publish a libel, making libel and threats to publish libel misdemeanors, giving a right of civil action therefor, and making obscene or indecent publications misdemeanors.

"By authority of the President of the United States, be it enacted · by the United States Philippine Commission that: Sec. 1. A libel is a malicious defamation, expressed either in writing, printing or by signs or pictures, or the like, or public theatrical exhibitions, tending to blacken the memory of one who is dead or to impeach the honesty, virtue or reputation or publish the alleged or natural defects of one who is alive, and thereby expose him to public hatred, contempt or ridicule.

  ·  \*    \*    \*    \*    \*    \*   ,\*    \*

"Sec. 4. In all criminal prosecutions for libel the truth may be given in evidence to the court, and if it appears to the court that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; otherwise he shall be convicted; but to establish this defence, not only must the truth of the matter so charged be proven, but also that it was published with good motives and for justifiable ends.

    \*    \*    \*    \*    \*    \*    \*    \*

"Sec. 6. Every author, editor or proprietor of any book, newspaper or serial publication is chargeable with the publication of any words contained in any part of such book or number of each newspaper or serial as fully as if he were the author of the same.

"SEC. 7. No reporter, editor or proprietor of any newspaper is liable to any prosecution for a fair and true report of any judicial, legislative or other public official proceedings, or of any statement, speech, argument or debate in the course of the same, except upon proof of malice in making such report, which shall not be implied from the mere fact of publication.

"SEC. 8. Libelous remarks or comments connected with matter privileged by the last section receive no privilege by reason of being so connected.

\*     \*     \*     \*     \*     \*     \*     \*

"Enacted October 24, 1901."

The contention is that the publication is privileged under sections 7 and 8, the claim being that the publication was a fair and truthful report of judicial proceedings. Testimony was introduced in the court below tending to show malice, and there was no proof to support the truth of the charges in the alleged libel, which were found to be without basis and wanton, and as the findings of the two lower courts in a cause brought in review here are not ordinarily disturbed, the case upon this branch might rest upon that proposition. It is evident, however, that the publication in question did not stop with a simple report of the judicial proceedings. Indeed, the paper offered in evidence could not have been received under the law then in force—a fact concerning which no comment was made in the report of the proceedings. Furthermore, section 8 of the law, while permitting as privileged a fair and truthful report of judicial proceedings, except upon express proof of malice, does not make privileged libelous remarks or comments in connection with the privileged matter. The draftsman of the law evidently had in mind the law of criminal libel in newspaper publications as it exists in this country. The privilege extends to a full and correct report of judicial proceedings without prejudicial comment. The rule is nowhere better stated than by Judge Cooley in his work on Constitutional Limitations, 7th ed. p. 637:

"It seems to be settled that a fair and impartial account of judicial proceedings, which have not been *ex parte*, but in the hearing of both parties, is, generally speaking, a justifiable publication. But it is said that if a party is to be allowed to publish what passes in a court of justice, he must publish the whole case, and not merely state the conclusion which he himself draws from the evidence. A plea that the supposed libel was, in substance, a true account and report of a trial has been held bad; and a statement of the circumstances of a trial as from counsel in the case has been held not privileged. The report must also be strictly confined to the actual proceedings in court, and must contain no defamatory observations or comments from any quarter whatsoever, in addition to what forms strictly and properly the legal proceedings."

Many cases are cited by the learned author in support of this conclusion. In *Hayes* v. *Press Co., Limited*, 127 Pa. St. 642, headlines stating "Hotel Proprietors Embarrassed," in giving an account of a judgment rendered in the suit of a bank against the proprietors of a certain hotel, was held not privileged. In Newell on Defamation, Libel and Slander, § 163, the author says:

"The publisher must add nothing of his own. He must not state his opinion of the conduct of the parties, or impute motives therefor; he must not insinuate that a particular witness committed perjury. That is not a report of what occurred; it is simply his comment on what occurred, and to this no privilege attaches. Often such comments may be justified on another ground—that they are fair and *bona fide* criticism on a matter of public interest, and are therefore not libelous. But such observations, to which quite different considerations apply, should not be mixed up with the history of the case. Lord Campbell said: 'If any comments are made, they should not be made as part of the report. The report should be confined to what takes place in court, and the two things—report and comment—should be kept

separate.' And all sensational headings to reports should be avoided." *Thomas* v. *Croswell*, 7 Johns. N. Y. 264.

These headlines were not privileged matter at the common law, and were libelous remarks or comments if the matter could be deemed otherwise privileged, within the meaning of § 8 of the Philippine libel law. An inspection of them would seem to be sufficient to demonstrate this fact. The complainant was held up to the public where the paper circulated in striking headlines as " Traitor, Seducer, Perjurer," and while these words were quoted as well as the phrase " Wife would have killed him," their publication in this manner was certainly the equivalent to a remark or comment unnecessary to a fair and truthful report of judicial proceedings, and likely to raise inferences highly detrimental to the character and standing of the one concerning whom they were printed and published.

Further error is assigned in that Act No. 277 of the laws of the Philippine Commission was not passed by competent legal authority. The act was one of the laws of the Philippine Commission, passed by that body by virtue of the authority given the President under the so-called Spooner resolution of March 2, 1901. The right of Congress to authorize a temporary government of this character is not open to question at this day. The power has been frequently exercised and is too well settled to require further discussion. *De Lima* v. *Bidwell*, 182 U. S. 1, 196.

*Judgment affirmed.*

MR. JUSTICE PECKHAM, concurring.

I concur in the result of the opinion of the court in this case, which upholds the conviction of the plaintiffs in error on a trial at Manila, Philippine Islands, for a criminal offense, without a jury. I do so simply because of the decision in *Hawaii* v. *Mankichi*, 190 U. S.197. That case was decided by the concurring views of a majority of this court, and although

I did not and do not concur in those views, yet the case in my opinion is authority for the result arrived at in the case now before us, to wit, that a jury trial is not a constitutional necessity in a criminal case in Hawaii or in the Philippine Islands. But, while concurring in this judgment, I do not wish to be understood as assenting to the view that *Downes* v. *Bidwell*, 182 U. S. 244, is to be regarded as authority for the decision herein. That case is authority only for the proposition that the plaintiff therein was not entitled to recover the amount of duties he had paid under protest upon the importation into the city of New York of certain oranges from the port of San Juan, in the Island of Porto Rico, in November, 1900, after the passage of the act known as the Foraker act. The various reasons advanced by the judges in reaching this conclusion, which were not concurred in by a majority of the court, are plainly not binding. The *Mankichi* case is, however, directly in point, and calls for an affirmance of this judgment.

I am authorized to say that the CHIEF JUSTICE and MR. JUSTICE BREWER agree in this concurring opinion.

MR. JUSTICE HARLAN, dissenting:

I do not believe now any more than I did when *Hawaii* v. *Mankichi*, 190 U. S. 197, was decided, that the provisions of the Federal Constitution as to grand and petit juries relate to mere methods of procedure and are not fundamental in their nature. In my opinion, guaranties for the protection of life, liberty and property, as embodied in the Constitution, are for the benefit of all, of whatever race or nativity, in the States composing the Union, or in any territory, however acquired, over the inhabitants of which the Government of the United States may exercise the powers conferred upon it by the Constitution.

The Constitution declares that *no* person, except in the land

or naval forces, shall be held to answer for a capital or otherwise infamous crime, except on the presentment or indictment of a grand jury; and forbids the conviction, in a criminal prosecution, of any person, for any crime, except on the unanimous verdict of a petit jury composed of twelve persons. Necessarily, that mandate was addressed to every one committing crime punishable by the United States. This court, however, holds that these provisions are not fundamental and may be disregarded in any territory acquired in the manner the Philippine Islands were acquired, although, as heretofore decided by this court, they could not be disregarded in what are commonly called the organized territories of the United States. *Thompson* v. *Utah*, 170 U. S. 343. I cannot assent to this interpretation of the Constitution. It is, I submit, so obviously inconsistent with the Constitution that I cannot regard the judgment of the court otherwise than as an amendment of that instrument by judicial construction, when a different mode of amendment is expressly provided for. Grand juries and petit juries may be, at times, somewhat inconvenient in the administration of criminal justice in the Philippines. But such inconveniences are of slight consequence compared with the dangers to our system of government arising from judicial amendments of the Constitution. The Constitution declares that it "shall be the supreme law of the land." But the court in effect adjudges that the Philippine Islands are not part of the "land," within the meaning of the Constitution, although they are governed by the sovereign authority of the United States, and although their inhabitants are subject in all respects to its jurisdiction—as much so as are the people in the District of Columbia or in the several States of the Union. No power exists in the judiciary to suspend the operation of the Constitution in any territory governed, as to its affairs and people, by authority of the United States. As a Filipino committing the crime of murder in the Philippine Islands may be hung by the sovereign authority of the United States, and as the Philippine Islands are under a

civil, not military, government, the suggestion that he may not, of right, appeal for his protection to the jury provisions of the Constitution, which constitutes the only source of the power that the Government may exercise at any time or at any place, is utterly revolting to my mind, and can never receive my sanction. The Constitution, without excepting from its provisions any persons over whom the United States may exercise jurisdiction, declares expressly that "the trial of all crimes, except in cases of impeachment, shall be by jury." It is now adjudged that that provision is not fundamental in respect of a part of the people over whom the United States may exercise full legislative, judicial and executive power. Indeed, it is adjudged, in effect, that the above clause, in its application to this case, is to be construed as if it read: "The trial of all crimes, except in cases of impeachment, *and except where Filipinos are concerned,* shall be by jury." Such a mode of constitutional interpretation plays havoc with the old-fashioned ideas of the fathers, who took care to say that the Constitution was the supreme law—supreme everywhere, at all times, and over all persons who are subject to the authority of the United States. According to the principles of the opinion just rendered, neither the Governor nor any American civil officer in the Philippines, although citizens of the United States, although under an oath to support the Constitution, and although in those distant possessions for the purpose of enforcing the authority of the United States, can claim, of right, the benefit of the jury provisions of the Constitution, if tried for crime committed on those Islands. There are many thousands of American soldiers in the Philippines. Besides, they are there by command of the United States to enforce its authority. They carry the flag of the United States, and have not lost their American citizenship. Yet, if charged in the Philippines with having committed a crime against the United States of which a civil tribunal may take cognizance, they cannot, under the present decision, claim of right a trial by jury. So that, if an

American soldier, in discharge of his duty to his country, goes into what some call our " outlying dependencies," he is, it seems, " outside of the Constitution," in respect of a right which this court has said was justly " dear to the American people," and has "always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy;" a right which, Mr. Justice Story said, was from very early times insisted on by our ancestors in the parent country "as the great bulwark of their civil and political liberties." *Parsons* v. *Bedford,* 3 Pet. 433, 446; 2 Story's Const. § 1779. Referring to the declaration by a French writer, that Rome, Sparta and Carthage having lost their liberties, those of England must in time perish, Blackstone observed that the writer " should have recollected that Rome, Sparta and Carthage, at the time their liberties were lost, were strangers to the trial by jury." 2 Bl. Comm. 379.

In a former case I had occasion to say, and I still think, that "neither the life, nor the liberty, nor the property of *any* person, within any territory or country over which the United States is sovereign, can be taken, under the sanction of any civil tribunal, acting under its authority, by any form of procedure inconsistent with the Constitution of the United States;" that "the Constitution is the supreme law in every territory, as soon as it comes under the sovereign dominion of the United States for purposes of civil administration, and whose inhabitants are under its entire authority and jurisdiction."

My views as to the scope and meaning of the provisions of the Constitution which relate to grand and petit juries, and as to the relations of the United States to our newly acquired possessions, have been more fully stated in cases heretofore decided in this court,[1] and I have therefore not deemed it

---

[1] *Hurtado* v. *California,* 110 U. S. 516, 538; *Thompson* v. *Utah,* 170 U. S. 343; *Maxwell* v. *Dow,* 176 U. S. 581, 605; *Downes* v. *Bidwell,* 182 U. S. 244, 375; *Hawaii* v. *Mankichi,* 190 U. S. 197, 221, 226.

necessary in the present case to enter upon a review of the authorities.

I dissent from the opinion and judgment of the court.