## MADSEN v. KINSELLA.

### No. 1095.

United States District Court
S. D. West Virginia.

Sept. 8, 1950.

---

320

Joseph S. Robinson, New York City, Harrington & Graham (Dayton M. Harrington), Washington, D.C., Jackson, Kelly, Morrison & Moxley (John C. Morrison), Charleston, W. Va., for petitioner.

A. Garnett Thompson, United States Attorney, Charleston, W. Va., John M. Ray-

mond, Colonel, Assistant Legal Adviser, Department of State, Washington, D. C., Joseph M. Sweeney, Assistant to Legal Adviser, Department of State, Washington, D. C., for respondent.

MOORE, District Judge.

On October 20, 1949, petitioner, being the wife of a Lieutenant serving in the American Army in the American Zone of Occupied Germany, and residing with her husband pursuant to military permission in Buchschleg, Kreis Frankfort, shot and killed her husband. She was tried before a tribunal originally known as a "United States Military Government Court for Germany," but whose name was later changed to the "United States Court of the Allied High Commission for Germany, Fourth Judicial District," which Military Government Court was created by an ordinance promulgated by the Department of the Army of the United States through the office of the Adjutant General. The crime with which she was charged was violation of Section 211 of the German Criminal Code, which defines the crime of murder and prescribes the penalty therefor. She was found guilty and, pursuant to Sections 51 and 44 of the same Code, ameliorating the punishment in certain cases, was sentenced to a term of fifteen years' confinement "in the Federal Reformatory for Women, Alderson, West Virginia, or elsewhere as the Secretary of the Army may direct."

On appeal to the Court of Appeals of the United States Courts of the Allied High Commission for Germany the conviction and sentence were affirmed; but the order of commitment was modified so as to provide that petitioner be committed "to the custody of the Attorney General of the United States or his authorized representative for imprisonment for a term of fifteen (15) years from 20 October 1949."

Pursuant to this commitment petitioner was confined in the Federal Reformatory for Women at Alderson, West Virginia, where she has since been in custody of the warden. She now seeks release by means of the writ of habeas corpus.

By Proclamation No. 2 of the Commanding General, United States Forces, European Theater, dated September 19, 1945, and addressed "To the German people in the United States Zone," it was declared in Article II thereof that "the German law in force at the time of the occupation shall be applicable in each area of the United States Zone of Occupation" except as otherwise provided by Military Government or other competent authority. See 12 F.R. 212, p. 6997.

Pursuant to Military Government Ordinance No. 31, which became effective August 18, 1948, a system of courts known as United States Military Government Courts for Germany was established for the United States Zone. These courts superseded other military courts which had theretofore been functioning in that area. Article 3 of the ordinance provides for a District Court in each of eleven judicial districts, established in accordance with Article 2. Article 4 provides for a Court of Appeals. Under Article 7 the jurisdiction of District Courts is extended to "all persons in the United States Area of Control" (meaning the United States Zone of Occupation) "except persons, other than civilians, who are subject to military, naval or air force law and are serving with any forces of the United Nations." The Article contains the limitation that "No person subject to military law of the United States shall be brought to trial for any offense except upon authorization of the Commander-in-Chief, European Command." It further provides that District Courts shall have jurisdiction to hear and decide not only those cases arising under legislation of the Allied Control Council and the United States Military Government, but also cases involving offenses under German law in force in the Judicial District of the Court. Ordinance No. 32 furnishes a code of criminal procedure for these courts. See 14 F.R. 7, pp. 124-128.

On December 11, 1948, by a letter to the Chief Attorney, United States Military Government Courts for Germany, General Lucius D. Clay, Commander-in-Chief, European Command, authorized the trial of any dependent of a member of the Unit-

ed States Armed Forces before the appropriate Military Government Court established by Ordinance No. 31, unless trial by court-martial should be directed in a particular case.

United States Military Government in Germany was carried on under the Department of the Army from its inception until September 21, 1949. On that date, the Occupation Statute for Western Germany, agreed to by the governments of the United States, the United Kingdom and France, was declared to be in force, thus putting into effect the Charter of the Allied High Commission, also agreed to by those governments. The Allied High Commission thereby came into existence, replacing the Office of Military Government for Germany. This likewise effected a change of the Office of United States Military Governor to that of United States High Commissioner.

The Occupation Statute restored full judicial powers to the German people subject to certain reserved powers which embraced the protection, prestige, security and immunities of Allied Forces and dependents. The Statute further provided for the codification of legislation based upon the reserved powers, which legislation was to remain in force. See 14 F.R. 239, pp. 7456, 7. Law No. 13 of the Allied High Commission, which became effective January 1, 1950, provided that German courts shall not exercise criminal jurisdiction over the Allied Forces. See 15 F.R. 38, pp. 1056, 7. Law No. 2, effective September 21, 1949, defines the expression "Allied Forces," whenever used in legislation of the Allied High Commission, as including members of the families of members of the Occupation Forces. See 14 F.R. 239, p. 7457.

By Law No. 1 of the United States High Commissioner, effective January 1, 1950, the name of the courts established under Ordinance No. 31 was changed from "United States Military Government Courts for Germany" to "United States Courts of the Allied High Commission for Germany." See 15 F.R. 71, p. 2086. The composition of these courts was left unchanged, and their criminal jurisdiction, insofar as dependents of members of the Allied Forces were concerned, was the same as that which had been exercised prior to the Occupation Statute. As already stated, it was one of these courts which, on February 20, 1950, brought petitioner to trial and later convicted her of the crime with which she was charged.

■ It should be said at the outset that whenever a prisoner invoking the power of a federal court files a petition containing allegations which, if true, entitle him to his freedom, the Great Writ of habeas corpus is the appropriate means whereby the right is tested. If the decision depends on disputed facts, the function of the Court is simple. The Court merely determines from the evidence what the facts are and renders judgment accordingly, the law not being in dispute.

On the other hand, in cases such as we have here, the Court faces a harder task. Petitioner and respondent are in complete agreement on the facts. Petitioner's challenge of the government's right to hold her in custody raises legal questions only; but it probes deeply into fundamental principles concerning limitations on executive and judicial power, and involves also the interpretation of important constitutional and statutory provisions.

■ These questions should be resolved by the Court only so far as they concern the rights of petitioner, but insofar as they do affect those rights, it is the duty of the Court to consider them fully and without regard to how the answers may impinge upon other persons or situations. The right of one illegally detained to be discharged from custody upon establishing the unlawful character of the detention is a right which must be granted though the full power, policy and governmental machinery of the State or Nation be arrayed in an effort to retain that custody.

Proceeding, therefore, to examine the problems presented, we find that petitioner's substantial contentions are as follows:

First, that the court by which she was tried and sentenced was lacking in jurisdiction to try anyone (especially any American citizen) because it was not established

nor were its judges appointed by any authority known to the American Constitution or to the common law of war.

Secondly, that if it should be held that the court had jurisdiction to try American citizens, yet it had no such jurisdiction to try them for violations of German law, nor to deny to them any of the rights guaranteed by the Constitution of the United States to its citizens when tried in its courts.

Thirdly, that petitioner is one of a class of persons who, by the provisions of the Articles of War, 10 U.S.C.A. § 1471 et seq., is subject to the exclusive jurisdiction of courts-martial.

Aside from a rather technical argument that an American citizen convicted abroad of an offense against the laws of a foreign country cannot legally be confined in a United States penitentiary, the foregoing are the only grounds urged by petitioner for her release.

■ The Constitution of the United States is the supreme law of the land, in war as well as in peace. However, its guaranties have no extra-territorial scope. When an American citizen (not a member of the Armed Forces) enters a foreign country, he becomes amenable to the laws of that country, and is triable by its courts, whose procedure may or may not be in conformity with American concepts of justice and fair play.

It may happen, as was the case with Germany, that unconditional surrender to a conquering army completely wipes out local sovereignty, leaving the territory of the conquered nation, pending a treaty of peace, without any body of enforceable law save that which may be imposed by the conqueror. The power, as well as the duty, then devolves upon the conquering nation, through the commander-in-chief of its occupying army, to provide a government to take the place of that which has been overthrown. One of the essential functions of this substitute government is to enact or adopt and administer a body or code of criminal laws. Historically and according to the law of war this is accomplished through decrees of the military commander-in-chief, establishing the law, framing the system of courts, prescribing rules of procedure, and appointing the judges.

■ The power of the United States thus to govern a conquered and occupied country does not stem from any explicit provision of the Federal Constitution. It is, however, implicit in the words of that instrument which make the President the commander-in-chief of the army and navy. Congress is vested by the Constitution with the power to declare war, and to raise and support armies; but the President, as commander-in-chief, is given the power to wage the war which Congress has declared. Ex parte Quirin, 317 U.S. 1, 26, 63 S.Ct. 1, 87 L.Ed. 3; Winthrop, Military Law and Precedents, (2nd Ed. 1920 Reprint), p. 831.

■ To establish and maintain civil government in a conquered country is certainly a function which grows out of the power to wage war. The situation in Germany is unusual in that the occupation has lasted more than five years; there is still no treaty of peace; and the occupying force still exercises all governmental functions which have not been restored to the German people by the Occupation Statute of September 21, 1949; yet despite this prolongation, the status remains that of a temporary occupation of conquered territory, and the relationships of all persons within its boundaries are fixed and determined by the law of war.

The chain of authority whereby the Military Government Courts were established and their jurisdiction delineated is clear. The Allied Powers, having conquered Germany, announced on June 5, 1945, their assumption of supreme authority within that country. This was followed on July 14, 1945, by a proclamation of General of the Army Dwight D. Eisenhower establishing a military government in the United States Zone. See 12 F.R. 212, p. 6997. Then came in succession Proclamation No. 2, Military Government Ordinances Nos. 31 and 32, the Occupation Statute, Laws Nos. 2 and 13 thereunder, and finally Law No. 1 of the United States High Commissioner changing the name of the courts. These acts of military legislation provided for every detail of the creation, composition,

324

jurisdiction and procedure of the occupation courts.

I am not impressed by petitioner's argument that there was a change in the nature or power of the court merely because, prior to the effective date of the Occupation Statute, the system of which it was a part operated under orders of the Department of the Army, but was afterwards carried on through the Department of State. It makes no difference through what agency he may act; the President is still commander-in-chief, and as such vested with power to continue the military government during the transition period between the cessation of hostilities and the treaty of peace. It is worthy of note that the Federal Constitution, from which the President's power as commander-in-chief is derived, makes no mention of separate departments of the government, nor does it limit him in the exercise of the powers which go with the office of military commander-in-chief.

■ I conclude that petitioner is one of a class jurisdiction over which was reserved by the Occupation Statute; and that the court which tried her had jurisdiction of her person, unless by the Articles of War such jurisdiction was vested exclusively in courts-martial, a question which will be later discussed.

■ The trial court also had jurisdiction of the subject matter. It is argued by respondent that because Proclamation No. 2, making German law applicable throughout the United States Zone of Occupation, was addressed to the German people, it could therefore have no application to American citizens. This contention is without merit. It is clear that the purpose of Proclamation No. 2 was to give German law a territorial, not an ethnological, application. It was not essential to its effectiveness that it be addressed to any particular group of people. It was sufficient that it be announced publicly as a decree of the commanding general. Moreover, we are not confined to Proclamation No. 2 in seeking and finding authority for the trial of American citizens for violation of German laws. Ordinance No. 2, whereby the predecessors of the later Military Government Courts were estab-

lished in occupied Germany on November 10, 1946, (See 12 F.R. 66, pp. 2190, 1), gives those courts jurisdiction over "all offences under the laws of the occupied territory or of any part thereof," and Ordinance No. 31, creating the court which tried petitioner, gives it jurisdiction of "offenses under German law in force in the Judicial District of the Court." There is no restriction of the jurisdiction to German citizens, and no exemption therefrom of American citizens.

If American citizens in occupied Germany (not under military law) were not subject to German criminal laws, what law or system of laws would control their actions? Not being under military law, they could not be required to obey the Articles of War; no criminal laws for the governance of occupied Germany other than the German criminal laws have been promulgated by the occupying authorities; so, if the criminal laws of Germany were not made applicable to non-military American citizens residing in that occupied country, as well as to the German people, we should behold the absurd spectacle of a class of persons licensed to commit all manner of crimes with impunity, because no criminal laws exist to which they are answerable.

■ Nor was it improper for the Military Government to authorize a code of criminal procedure which differed from that prescribed for courts-martial in the Articles of War. As we have seen, these military tribunals are created pursuant to the President's power to wage the war which Congress has declared. It cannot be said that they are necessarily to be governed in procedural matters by the provisions of the Articles of War enacted to guide trials by court-martial. The President has independent power to establish such rules of procedure as he may see fit.

It is therefore clear that petitioner's American citizenship did not immunize her from trial for a violation of the German statute against murder.

■ As to petitioner's complaint that she was deprived of certain rights guaranteed by the Bill of Rights of the United States Constitution, it is sufficient to say that the law has long been settled that these

guaranties do not apply to citizens of the United States living or sojourning in a foreign country who are brought to trial in that country on charges of violating local laws. In re Ross, 140 U.S. 453, 11 S.Ct. 897, 35 L.Ed. 581; Dorr v. United States, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128, 1 Ann. Cas. 697; Balzac v. People of Porto Rico, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627; In re Bush, Habeas Corpus No. 3544, (unpublished), D.C.D.C., June 29, 1949.[1] The Balzac and Dorr cases were both concerned with the question of whether constitutional guaranties were effective in territories acquired by the United States, but not yet incorporated as a part thereof. It was held in those cases that the guaranties were not applicable, the Court saying in the Dorr case in 195 U.S. at page 149, 24 S.Ct. at page 813:

"We conclude that the power to govern territory, implied in the right to acquire it, and given to Congress in the Constitution in article 4, § 3, to whatever other limitations it may be subject, the extent of which must be decided as questions arise, does not require that body to enact for ceded territory not made a part of the United States by Congressional action, a system of laws which shall include the right of trial by jury, and that the Constitution does not, without legislation, and of its own force, carry such right to territory so situated."

Since the Bill of Rights of the Federal Constitution is inoperative with respect to legal proceedings in territory owned by the United States, though not officially absorbed into its corporate body, a fortiori these guaranties do not control a trial such as petitioner underwent.

It was stated in argument that the chief contention of petitioner is that courts-martial of the United States Army of Occupation had exclusive jurisdiction to try her, and that the trial in such case must have been for a violation of the Articles of War and must have been conducted according to the procedure prescribed by the Articles of War. The basis of this contention is that Article 2 of the Articles of War, bringing under military law persons "accompanying" the army in a foreign country or in

the field in time of war, is applicable to petitioner as the wife of an army officer residing with him at an Army Post in occupied Germany.

Prior to the year 1916 Article 2 of the Articles of War did not extend to persons accompanying the army. This class of persons was made subject to military law by an amendment adopted in that year. Congress, by Article 15 of the Articles of War, enacted simultaneously with the amendment to Article 2, provided as follows:

"The provisions of these articles conferring jurisdiction upon courts-martial shall not be construed as depriving military commissions, provost courts, or other military tribunals of concurrent jurisdiction in respect of offenders or offenses that by the law of war may be lawfully triable by such military commissions, provost courts, or other military tribunals."

These two articles, with some slight changes in the language of Article 15 not material here, have been in effect since 1916.

 Petitioner recognizes that concurrent jurisdiction was by Article 15 reserved to military commissions and other military tribunals to try certain classes of offenders and offenses; but she maintains that this jurisdiction was confined to persons who by statute are made amenable to such commissions or who commit offenses against the laws of war; that is, offenses such as relieving or communicating with the enemy; carrying on illicit trade or intercourse; spying; pilferage; or abusing prisoners. In my opinion, this interpretation of the language reserving jurisdiction to military commissions and tribunals is much too narrow. Offenses which by the *law* of war are triable by military commissions and other military tribunals include offenses against the *laws* of war, but are not confined to such offenses. The law of war, as defined by Winthrop, comprises "those principles and usages which, in time of war, define the status and relations not only of enemies—whether or not in arms—but also of persons under military government or martial law and per-

---

1. Not indicated for publication.

sons simply resident or being upon the theatre of war, and which authorizes their trial and punishment when offenders." Winthrop, p. 773. It is under the law of war, as thus defined, that military tribunals such as the court which tried petitioner are created, and it is in accordance therewith that their jurisdiction is defined. The law of war imposes upon an occupying army the obligation to furnish the inhabitants of the country with a system of laws and courts; and since the power must be coextensive with the obligation, the jurisdiction of the military courts or commissions which are set up by the occupying army extends to whatever matters may be committed to such tribunals by the commander-in-chief of the occupation force. This construction is one which has long been recognized, as is witnessed by the following excerpt from an opinion of the Judge Advocate General of the Army, reported in Digest of Opinions of the Judge Advocates General (1912 edition) at page 1067:

"The jurisdiction of the military commission is derived primarily and mainly from the law of war; * * * Military commissions are authorized by the laws (sic) of war to exercise jurisdiction over two classes of offenses, committed, whether by civilians or military persons, either (1) in the enemy's country during its occupation by our armies and while it remains under military government, or (2) in a locality, not within the enemy's country or necessarily within the theater of war, in which *martial law* has been established by competent authority. The two classes of offenses are: I. Violations of the laws of war. II. Civil crimes, which, because the civil authority is superseded by the military and the civil courts are closed or their functions suspended, can not be taken cognizance of by the ordinary tribunals."

The reservation of jurisdiction to military commissions and other military tribunals by Article 15 of the Articles of War was therefore plenary in its scope. They were not deprived of any jurisdiction which they could theretofore lawfully exercise. The only question to be decided in this connection is: Did military commissions and other military tribunals prior to the year 1916 have jursidiction to try the wife of a soldier residing with her husband in an occupied foreign country?

No case has been brought to my attention involving the trial of a soldier's wife by a military commission; but no difference is perceived between her status prior to the 1916 amendment and that of any other civilian who might be accompanying the army although not connected with it in any of its activities; and since military tribunals undoubtedly had jurisdiction to try such other persons for violations of local criminal laws, this jurisdiction would necessarily extend to the wives of soldiers. It is true that some support may be found in Winthrop's treatise for the theory that wives who accompanied their soldier husbands were to be regarded as "retainers to the camp" (See Winthrop, p. 99, note 94); but this conception of a wife's function, which may have been tenable in more primitive times, had certainly lost its force long prior to the year 1916. No one, being realistic, could say that at that time a wife who accompanied her husband on a tour of duty in the army was a "retainer to the camp."

Moreover, the inclusion of retainers to the camp and persons accompanying or serving with the armies of the United States in those classes of persons who are subject to military law was not made by Congress for the purpose of extending protection or immunity to such persons. The army in time of war, and particularly while on foreign soil, needs a swift and efficacious means of dealing with all persons who are connected with it in any way. "All delays are dangerous in war." It is for the better discipline of the army and the more efficient conduct of military operations that Article 2 of the Articles of War brings under military law certain classes of persons who are not soldiers in the army. There is no indication anywhere in the Articles of War that these persons are not subject as well to the concurrent jurisdiction of military commissions or other military tribunals when such tribunals have been established in occupied countries and vested with jursidiction to enforce local laws.

I am of opinion therefore that prior to the 1916 Amendments to the Articles of War, the wives of soldiers in occupied foreign territory who committed crimes against local laws which military commissions or tribunals had been set up to administer were triable by such military tribunals; and that Article 15 effectively reserved jurisdiction to such tribunals to try and punish such persons.

I do not find it necessary to decide whether or not petitioner, as the wife of a soldier, is properly classified as a person "accompanying" the army. It is not admitted by respondent that she ought to be so classified, but if not so classified, she was at least a dependent of an army officer. It will be readily noted that if she is properly classified as a person "accompanying" the army, and therefore subject to military law, then the military court which tried her had concurrent jurisdiction, while if she is to be classed as a civilian dependent of an army officer but not subject to military law, then that court had exclusive jurisdiction. Therefore, her classification becomes immaterial.

Finally, it is petitioner's claim that she was improperly committed to the custody of the Attorney General of the United States for imprisonment in a penitentiary, because commitment to the Attorney General's custody is authorized only for those persons convicted of offenses against the United States, citing 18 U.S.C. A. § 4082, whereas petitioner was convicted of an offense under the German Criminal Code. It is enough to say that the statute here applicable is 10 U.S.C.A. § 1452, which provides that "Persons sentenced to confinement upon conviction by courts-martial or other military tribunals of crimes or offenses which, under some statute of the United States or under some law of the State, Territory, District, or other jurisdiction in which the crime or offense may be committed, are punishable by confinement in a penitentiary * * * may be confined * * * in any United States, State, Territorial, or District penitentiary, or in any other penitentiary directly or indirectly under the jurisdiction of the United States * * *." It is clear that the clause "or other jurisdiction in which the crime or offense may be committed" widens the territorial orbit of applicability of the statute so as to embrace United States citizens tried and convicted by courts established abroad under the authority of the United States, such as was the military tribunal which tried and convicted petitioner. Inasmuch as 10 U.S.C. A. § 1452 does not designate the person to whose custody one convicted by a military tribunal is to be committed, I think it was proper that the Court of Appeals place petitioner in the custody of the Attorney General, pursuant to a directive to that effect of the Secretary of State of the United States.

Petitioner has alleged no fact which warrants her release. Therefore an order will be entered remanding her to the custody of the Attorney General.