MORALES ET AL., PETITIONERS, *v.* BOARD OF REGISTRATION, RESPONDENT.

PETITIONS for Writs of Mandamus against the Local Registration and Election Board for the First Precinct of San Juan.

Nos. 219 and 220.—Decided April 25, 1924.

FEMALE SUFFRAGE—CONSTITUTIONAL LAW.—The laws of Porto Rico do not confer upon women the right to vote and as the Nineteenth Amendment to the American Constitution was not extended to Porto Rico by an express declaration of Congress and the right of suffrage is not a fundamental individual right, the local law is, in full force and effect.

The facts are stated in the opinion.

*Mr. B. Pagán* for the petitioners.

*Mr. M. A. Muñoz, Assistant Attorney General,* for the respondent.

*Mr. C. Coll Cuchí, amicus curiæ.*

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

On March 24, 1924, there was filed in the office of the secretary of this Supreme Court a petition for a writ of mandamus alleging substantially the following:

That the petitioner, Mariana Morales Bernard, is a citi-

zen of the United States of America, over twenty-one years of age, a resident of San Juan, P. R., and a cigarmaker by trade; that she is a native of Porto Rico, has resided in the Island all of her life and for more than one year has lived in Puerta de Tierra, a ward of the Municipality of San Juan, P. R.; that she has never been convicted of felony, or of any electoral crime, and is not an inmate of any public or private institution for the insane; that she is not under the care of a guardian and does not live on public or private charity; that she possesses all of the constitutional, statutory and regulation requirements for registering and voting at the general election of 1924; that the respondent is the Local Board of Registration and Elections for the First Precinct of San Juan and is composed of the persons named, having the duties specified and with capacity to sue and to be sued; that on March 24, 1924, the petitioner appeared personally at the place where the respondent was in session and after complying with all of the formalities required by the regulations, asked to be registered as a voter and the respondent refused to register her only because of her sex.

The afternoon of March 31st was set for hearing the petitioner and the Attorney General, if he disired to be heard.

Meanwhile another petition of the same nature was filed by Milagros Benet de Mewton and attorney Cayetano Coll y Cuchí, in the name of the Social League of Suffragettes of Porto Rico, asked to be heard as *amicus curiæ*. The court made a similar setting and on March 31st the two petitioners appeared by attorney Bolívar Pagán and the *amicus curiæ,* and Assistant Attorney General Miguel A. Muñoz appeared for the respondent. At the close of the hearing the parties were allowed five days within which to present memorandums of authorities. They were seasonably filed and the case was thus finally submitted to this court.

Has a woman over twenty-one years of age who pos-

sesses all of the other statutory requirements a right to vote in Proto Rico at present? That is the question involved in this case.

The local statute is as follows: "Every male citizen of the United States * * * shall vote * * *."

The Act passed by the Legislative Assembly of Porto Rico and approved by the Governor requires, therefore, as a qualification for voting that the electors shall be males; hence women being excluded.

In this connection the Organic Act provides as follows:

"Section 35.—That at the first election held pursuant to this Act the qualified electors shall be those having the qualifications of voters under the present law. Thereafter voters shall be citizens of the United States twenty-one years of age or over and have such additional qualifications as may be prescribed by the Legislature of Porto Rico; *Provided,* That no property qualification shall ever be imposed upon or required of any voter."

The Act of Congress is clear. With the exception of the qualifications of being a citizen of the United States and of having reached the age therein fixed and of the prohibition to impose any property qualification, it gives absolute power to the Legislature of Porto Rico to prescribe the other qualifications. We have seen the use that the Legislature made of its power.

It is maintained by the petitioners that in construing said section 35 of the Organic Act it is necessary to consider the intention of Congress, and that it will be observed that the intention was that no distinction should be established among the electors by reason of sex, the Porto Rican statute being, therefore, void. This conclusion is based on the fact that a substitute for section 35 was offered reading as follows: "Section 35.—That qualified electors shall be all males who are 21 years of age and over, and who are citizens of the United States." That substitute was defeated.

The intention of the legislators is deduced from the actual language of the statute as finally approved and there is nothing in section 35 to support the conclusion of the petitioners. But even resorting to the same source of information that they invoke, with the reservation that doing so does not imply that the court admits that in this way the intention of the lawmakers may be determined, it will be seen that this information is adverse to their cause.

The substitute to which reference has been made was offered on February 17, 1917, (Congressional Record, vol. 54, part 4, page 3477) and later withdrawn. Thereafter, on February 20, 1917, an amendment was offered reading as follows: ''That at the first election held pursuant to this act the qualified electors shall be those having the qualifications of voters under the present law; thereafter voters shall be citizens of the United States, 21 years of age or over, and have such additional qualifications as may be prescribed.'' This is substantially the same as section 35 as finally passed, and during its discussion the following occurred:

''Mr. Martine of New Jersey. I read in a newspaper quite recently an article wherein it was stated that this bill proposes to grant the right of suffrage to the women of Porto Rico. If that is the case, I shall not knowingly vote for the measure, for I am unqualifiedly opposed to woman suffrage. I think it would be a detriment to the Commonwealth, and I believe it would be a misfortune and disaster for the women. If I believed that it would elevate women and enhance the well-being of our Nation, I would advocate it; but the contrary, to my mind, is true.

''Mr. Shafroth. I will state to the Senator that under the present law women do not vote, and consequently the bill confers no particular privilege upon them except that it gives the Legislature of Porto Rico the right to determine such questions, just as the acts of Congress do which create Territories.'' Congressional Record, vol. 54, part 4, page 3667.

But the petitioners go still farther and this brings out the real legal problem presented by them in this case. They

maintain that from the moment that the Nineteenth Amendment to the Constitution of the United States became the supreme law of the land neither the Legislature of Porto Rico nor the Congress could pass any act depriving a person of the privilege of voting in this Island on account of sex.

The said amendment to the Constitution reads as follows:

"The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex."

If the amendment is applicable, the case must be decided in favor of the petitioners. There is no doubt about that. The question is thus reduced to whether the constitutional amendment is in force in Porto Rico, and this presents one of the most serious problems with which the Supreme Court of the United States was confronted after the Spanish-American war and which for more than twenty years has time and again engaged the attention of the justices of that court until it appears to have been definitely settled in the case of *Balzac* v. *People of Porto Rico,* 258 U. S. 298.

Referring to that problem, Charles Warren, at page 429 of volume 3 of his work called "The Supreme Court in United States History," says:

"In 1899, there began the long series of cases growing out of the Spanish War, which occupied much of the attention of the Court during the next six years. The first to be decided were a group of prize cases in which various important points of international law were settled. These were followed, in May, 1901, by the notable cases, lasting until 1905, in which the status and constitutional rights of Cuba, of the newly acquired territory of Porto Rico and the Philippines and of Hawaii were at last definitely settled. 'This judicial drama of truly Olympian proportions' constituted by far the most important fact in the Court's history during the period since Waite's death, and has been interestingly summarized as follows. 'When the Spanish War had resulted in the cession to the United States of Porto Rico and the Philippines, the question of their constitutional status at once arose. It entered immediately

into the political arena, and in the Presidential campaign of 1900 divided, with the cry of "Imperialism", political parties and their adherents. The discord which it created in the judicial forum was no less pronounced. The *De Lima, Dooley* and *Bidwell Cases* presented in concrete form the questions whether the Island of Porto Rico, after its cession by Spain, ceased to be "foreign country", within the meaning of the existing tariff laws of the United States; and secondly, to what extent, if at all, the island fell within the revenue clauses of the Constitution, and the requirement that duties, imposts and excises should be uniform throughout the United States. The division of opinion on the Court was sharp and pronounced. The first view was that of Mr. Justice Brown, alone. He plowed a lonely furrow and held that, while Porto Rico had ceased to be "foreign country" within the meaning of the Dingley Act, yet, as to future legislation (the Foraker Act of April 12, 1900), the uniform clause did not apply; that Porto Rico became by the cession "territory appurtenant" to the United States, but not a part of it; and that even over continental and contiguous territory, the Constitution went only as the result of express Congressional action. As against this, Chief Justice Fuller, and Justices Harlan, Brewer, and Peckham maintained that Porto Rico, at least upon the ratification of the treaty, became a part of the United States, and as such could be dealt with only in the manner which the Constitution provides; or, in the language of the hour, the "Constitution follows the flag." Between these two extremes were to be found Justices White, McKenna, Shiras and Gray, who maintained that the government of the United States has power to acquire and hold territory without immediately incorporating it into the United States, and that Congress can determine when acquired territory has reached that state where it is proper that it should enter into and form a part of the American family; and that Porto Rico, though not a foreign country in an international sense, since it was subject to and under the sovereignty of the United States after the treaty of cession, continued to be foreign to the United States in a domestic sense because it had not been incorporated into the United States, but was merely appurtenant thereto as a possession. These views were defended with a wealth of reasoning and a warmth of argument worthy of the greatness of the issue, but with the curious result that the judgment in the *De Lima* and *Dooley Cases* was concurred in, though for wholly different reasons, by Justices Brown, Harlan, Brewer, Peckham and the Chief Justice; while that in the *Downes Case* was supported by Justices Brown, White, McKenna, Shiras

and Gray. * * * Judge White's "Idea of incorporation" was destined to prevail. * * * In *Hawaii* v. *Mankichi*, in 1903, the constitutional guaranties of trial by jury were held inapplicable to the Hawaiian Islands, Justice White taking occasion for himself and Justice McKenna to reiterate their views in *Downes* v. *Bidwell*, and Justices Fuller, Brewer, Harlan and Peckham filing the customary dissent. A year later came the case of *Dorr* v. *The United States* in which the opinion written by Justice Day, who meanwhile had come upon the Bench, held that the right of trial by jury was not extended by the Federal Constitution, without legislation and of its own force; to the Philippine Islands, ceded to the United States by Spain, but not incorporated into the United States by Congressional action. * * * Finally, in *Rassmussen* v. *United States,* the question arose with reference to Alaska, and at last Justice White, writing for a clear majority of the Court, was able to repeat with authority the views he had all along maintained. * * * Justice Harlan, although concurring in the instant result, nailed his colors to the mast on the main question and went down fighting to the last. Years later, in speaking of the controversy, Chief Justice White evidenced the depth of his conviction by the remark, "Why, sir, if we had not decided as we did, this country would have been less than a Nation!" ' The capsheaf of the doctrine of incorporation was applied in *Porto Rico* v. *Tapia,* in 1918, when the Court held that rights guaranteed by the Constitution might be withheld by Congress from an unincorporated territory even though Congress had granted United States citizenship to the inhabitants of such territory." The Supreme Court in United States History, vol. 3, pages 429–33.

When the work just cited was published the *Balzac Case, supra,* had not been decided. In the *Tapia* and *Muratti Cases,* 245 U. S. 639, the Supreme Court handed down no opinion, thus disappointing the expectations of those who firmly believed and fully expressed their opinions (*Muratti* v. *Foote,* 25 P.R.R. 527) that when American citizenship was bestowed upon the Portoricans collectively all of the requirements of the jurisprudence of the Supreme Court had been complied with and Porto Rico should be considered as a territory definitely incorporated into the Union. It seems that the court took notice of this and when William

Howard Taft, former President of the United States, former Secretary of War and former Governor of the Philippines, was appointed Chief Justice of the court, at the first opportunity he delivered an opinion laying down the view of the Court in unequivocal terms, as follows:

"We have now to inquire whether that part of the Sixth Amendment to the Constitution, which requires that, in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, applies to Porto Rico. Another provision on the subject is in Article III of the Constitution providing that the trial of all crimes except in cases of impeachment, shall be by jury; and such trial shall be held in the State where the said crimes shall have been committed; but, when not committed within any State, the trial shall be at such place or places as the Congress may by law have directed. The Seventh Amendment of the Constitution provides that in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved. It is well settled that these provisions for jury trial in criminal and civil cases apply to the Territories of the United States. *Webster* v. *Reid,* 11 How. 437, 460; *Reynolds* v. *United States,* 98 U. S. 145, 167; *Callan* v. *Wilson,* 127 U. S. 540, 556; *American Publishing Co.* v. *Fisher,* 166 U. S. 464; *Thompson* v. *Utah,* 170 U. S. 343, 347; *Capital Traction Co.* v. *Hof,* 174 U. S. 1; *Black* v. *Jackson,* 177 U. S. 349; *Rassmussen* v. *United States,* 197 U. S. 516, 528; *Gurvich* v. *United States,* 198 U. S. 581. But it is just as clearly settled that they do not apply to territory belonging to the United States which has not been incorporated into the Union. *Hawaii* v. *Mankichi,* 190 U. S. 197; *Dorr* v. *United States,* 195 U. S. 138, 145. It was further settled in *Downes* v. *Bidwell,* 182 U. S. 244, and confirmed by *Dorr* v. *United States,* 195 U. S. 138, that neither the Philippines nor Porto Rico was territory which had been incorporated in the Union or become a part of the United States, as distinguished from merely belonging to it; and that the acts giving temporary governments to the Philippines, 32 Stat. 691, and to Porto Rico, 31 Stat. 77, had no such effect. The *Insular Cases* revealed much diversity of opinion in this court as to the constitutional status of the territory acquired by the Treaty of Paris ending the Spanish War, but the *Dorr Case* shows that the opinion of

Mr. Justice White of the majority, in *Downes* v. *Bidwell,* has become the settled law of the court. The conclusion of this court in the *Dorr Case,* p. 149, was as follows:

" 'We conclude that the power to govern territory, implied in the right to acquire it, and given to Congress in the Constitution in Article IV, sec. 3, to whatever other limitations it may be subject, the extent of which must be decided as questions arise, does not require that body to enact for ceded territory, not made a part of the United States by Congressional action, a system of laws which shall include the right of trial by jury, and that the Constitution does not, without legislation and of its own force, carry such right to territory so situated.'

"The question before us, therefore, is: Has Congress, since the Foraker Act of April 12, 1900, c. 191, 31 Stat. 77, enacted legislation incorporating Porto Rico into the Union? Counsel for the plaintiff in error give, in their brief, an extended list of acts, to which we shall refer later, which they urge as indicating a purpose to make the Island a part of the United States, but they chiefly rely on the Organic Act of Porto Rico of March 2, 1917, c. 145, 39 Stat. 951, known as the Jones Act.

"The Act is entitled 'An Act To provide a civil government for Porto Rico, and for other purposes.' It does not indicate by its title that it has a purpose to incorporate the Island into the Union. It does not contain any clause which declares such purpose or effect. While this is not conclusive, it strongly tends to show that Congress did not have such an intention. Few questions have been the subject of such discussion and dispute in our country as the status of our territory acquired from Spain in 1899. The division between the political parties in respect to it, the diversity of the views of the members of this court in regard to its constitutional aspects, and the constant recurrence of the subject in the Houses of Congress, fixed the attention of all on the future relation of this acquired territory to the United States. Had Congress intended to take the important step of changing the treaty status of Porto Rico by incorporating it into the Union, it is reasonable to suppose that it would have done so by the plain declaration, and would not have left it to mere inference. Before the question became acute at the close of the Spanish War, the distinction between acquisition and incorporation was not regarded as important, or at least it was not fully understood and had not aroused great controversy. Before that, the purpose of Congress might well be a matter of mere inference from various legislative acts; but in these latter days, incorporation is

not to be assumed without express declaration, or an implication so strong as to exclude any other view.

"Again, the second section of the act is called a 'Bill of Rights', and included therein is substantially every one of the guaranties of the Federal Constitution, except those relating to indictment by a grand jury in the case of infamous crimes and the right of trial by jury in civil and criminal cases. If it was intended to incorporate Porto Rico into the Union by this act, which would *ex proprio vigore* make applicable the whole Bill of Rights of the Constitution to the Island, why was it thought necessary to create for it a Bill of Rights and carefully exclude trial by jury? In the very forefront of the act is this substitute for incorporation and application of the Bill of Rights of the Constitution. This seems to us a conclusive argument against the contention of counsel for the plaintiff in error.

"The section of the Jones Act which counsel press on us is section 5. This in effect declares that all persons who under the Foraker Act were made citizens of Porto Rico and certain other residents shall become citizens of the United States, unless they prefer not to become such, in which case they are to declare such preference within six months, and thereafter they lose certain political rights under the new government. In the same section the United States District Court is given power separately to naturalize individuals of some other classes of residents. We set out the section in full in the margin. Unaffected by the considerations already suggested, perhaps the declaration of section 5 would furnish ground for an inference such as counsel for plaintiff in error contend, but under the circumstances we find it entirely consistent with non-incorporation. When Porto Ricans passed from under the government of Spain, they lost the protection of that government as subjects of the King of Spain, a title by which they had been known for centuries. They had a right to expect, in passing under the dominion of the United States, a status entitling them to the protection of their new sovereign. In theory and in law, they had it as citizens of Porto Rico, but it was an anomalous status, or seemed to be so in view of the fact that those who owed and rendered allegiance to the other great world powers were given the same designation and status as those living in their respective home countries so far as protection against foreign injustice went. It became a yearning of the Porto Ricans to be American citizens, therefore, and this act gave them the boon. What additional rights did it give them? It enabled them to move into the continental United States and becoming residents of any State there to enjoy

every right of any other citizen of the United States, civil, social and political. A citizen of the Philippines must be naturalized before he can settle and vote in this country. Act of June 29, 1906, c. 3592, sec. 30, 34 Stat. 606. Not so the Porto Rican under the Organic Act of 1917.

"In Porto Rico, however, the Porto Rican can not insist upon the right of trial by jury, except as his own representatives in his legislature shall confer it on him. The citizen of the United States living in Porto Rico can not there enjoy a right of trial by jury under the Federal Constitution, any more than the Porto Rican. It is locality that is determinative of the application of the Constitution, in such matters as judicial procedure, and not the status of the people who live in it.

"It is true that, in the absence of other and countervailing evidence, a law of Congress or a provision in a treaty acquiring territory, declaring an intention to confer political and civil rights on the inhabitants of the new lands as American citizens, may be properly interpreted to mean an incorporation of it into the Union, as in the case of Louisiana and Alaska. This was one of the chief grounds upon which this court placed its conclusion that Alaska had been incorporated in the Union, in *Rassmussen* v. *United States,* 197 U. S. 516. But Alaska was a very different case from that of Porto Rico. It was an enormous territory, very sparsely settled and offering opportunity for immigration and settlement by American citizens. It was on the American Continent and within easy reach of the then United States. It involved none of the difficulties which incorporation of the Philippines and Porto Rico presents, and one of them is in the very matter of trial by jury. This court refers to the difficulties in *Dorr* v. *United States,* 195 U. S. 138, 148:

" 'If the right to trial by jury were a fundamental right which goes wherever the jurisdiction of the United States extends, or if Congress, in framing laws for outlying territory belonging to the United States was obliged to establish that system by affirmative legislation, it would follow that, no matter what the needs or capacities of the people, trial by jury, and in no other way, must be forthwith established, although the result may be to work injustice and provoke disturbance rather than to aid the orderly administration of justice. * * *. Again, if the United States shall acquire by treaty the cession of territory having an established system of jurisprudence, where jury trials are unknown, but a method of fair and orderly trial prevails under an acceptable and long-established code, the preference of the people must be disregarded, their estab-

lished customs ignored and they themselves coerced to accept, in advance of incorporation into the United States, a system of trial unknown to them and unsuited to their needs.   We do not think it was intended, in giving power to Congress to make regulations for the territories, to hamper its exercise with this condition.'

''The jury system needs citizens trained to the exercise of the responsibilities of jurors.   In common law countries centuries of tradition have prepared a conception of the impartial attitude jurors must assume.   The jury system postulates a conscious duty of participation in the machinery of justice which it is hard for people not brought up in fundamentally popular government at once to acquire.   One of its greatest benefits is in the security it gives the people that they, as jurors actual or possible, being part of the judicial system of the country can prevent its arbitrary use or abuse.   Congress has thought that a people like the Filipinos or the Porto Ricans, trained to a complete judicial system which knows no juries, living in compact and ancient communities, with definitely formed customs and political conceptions, should be permitted themselves to determine how far they wish to adopt this institution of Anglo-Saxon origin, and when.   Hence the care with which from the time when Mr. McKinley wrote his historic letter to Mr. Root in April of 1900, Public Laws, Philippine Commission, pp. 6–9—Act of July 1, 1902, c. 1369, 32 Stat. 691, 692, concerning the character of government to be set up for the Philippines by the Philippine Commission, until the Act of 1917, giving a new Organic Act to Porto Rico, the United States has been liberal in granting to the Islands acquired by the Treaty of Paris most of the American constitutional guaranties, but has been sedulous to avoid forcing a jury system on a Spanish and civil-law country until it desired it.   We can not find any intention to depart from this policy in making Porto Ricans American citizens, explained as this is by the desire to put them as individuals on an exact equality with citizens from the American homeland, to secure them more certain protection against the world, and to give them an opportunity, should they desire, to move into the United States proper and there without naturalization to enjoy all political and other rights.

''We need not dwell on another consideration which requires us not lightly to infer, from acts thus easily explained on other grounds, an intention to incorporate in the Union these distant ocean communities of a different origin and language from those of our continental people.   Incorporation has always been a step, and an important one, leading to statehood.   Without, in the slightest degree,

intimating an opinion as to the wisdom of such a policy, for that is not our province, it is reasonable to assume that when such a step is taken it will be begun and taken by Congress deliberately and with a clear declaration of purpose, and not left a matter of mere inference or construction.

"Counsel for the plaintiff in error also rely on the organization of a United States District Court in Porto Rico, on the allowance of review of the Porto Rican Supreme Court in cases when the Constitution of the United States is involved, on the statutory permission that Porto Rican youth can attend West Point and Annapolis Academies, on the authorized sale of United States stamps in the Island, on the extension of revenue, navigation, immigration, national banking, bankruptcy, federal employers' liability, safety appliance, extradition, and census laws in one way or another to Porto Rico. With the background of the considerations already stated, none of these nor all of them put together furnish ground for the conclusion pressed on us.

"The United States District Court is not a true United States court established under Article III of the Constitution to administer the judicial power of the United States therein conveyed. It is created by virtue of the sovereign congressional faculty, granted under Article IV, sec. 3, of that instrument, of making all needful rules and regulations respecting the territory belonging to the United States. The resemblance of its jurisdiction to that of true United States courts in offering an opportunity to nonresidents of resorting to a tribunal not subject to local influence, does not change its character as a mere territorial court. Nor does the legislative recognition that federal constitutional questions may arise in litigation in Porto Rico have any weight in this discussion. The Constitution of the United States is in force in Porto Rico as it is wherever and whenever the sovereign power of that government is exerted. This has not only been admitted but emphasized by this court in all its authoritative expressions upon the issues arising in the *Insular Cases,* especially in the *Downes* v. *Bidwell* and the *Dorr Cases.* The Constitution, however, contains grants of power and limitations which in the nature of things are not always and everywhere applicable, and the real issue in the *Insular Cases* was not whether the Constitution extended to the Philippines or Porto Rico when we went there, but which of its provisions were applicable by way of limitation upon the exercise of executive and legislative power in dealing with new conditions and requirements. The guaranties of certain fundamental personal rights declared in the Constitution, as for instance that no person

could be deprived of life, liberty or property without due process of law, had from the beginning full application in the Philippines and Porto Rico, and, as this guaranty is one of the most fruitful in causing litigation in our own country, provision was naturally made for similar controversy in Porto Rico. Indeed provision is made for the consideration of constitutional questions coming on appeal and writ of error from the Supreme Court of the Philippines, which are certainly not incorporated in the Union. Judicial Code, sec. 248.

"On the whole, therefore, we find no features in the Organic Act of Porto Rico of 1917 from which we can infer the purpose of Congress to incorporate Porto Rico into the United States with the consequences which would follow.

"This court has passed on substantially the same questions presented here in two cases, *Porto Rico* v. *Tapia,* and *Porto Rico* v. *Muratti,* 245 U. S. 639. In the former, the question was whether one who was charged with committing a felonious homicide some twelve days after the passage of the Organic Act in 1917, could be brought to trial without an indictment of a grand jury as required by the Fifth Amendment to the Constitution. The United States District Court of Porto Rico on a writ of habeas corpus held that he could not be held to answer and discharged him. In the other case, the felony charged was alleged to have been committed before the passage of the Organic Act, but prosecution was begun afterwards. In that, the Supreme Court of Porto Rico held that an indictment was rendered necessary by the Organic Act. This court reversed the District Court in the *Tapia Case* and the Supreme Court in the *Muratti Case,* necessarily holding the Organic Act had not incorporated Porto Rico into the United States. These cases were disposed of by a *per curiam.* Counsel have urged us in the cases at the bar to deal with the questions raised more at length in exposition of the effect of the Organic Act of 1917 upon the issue, and we have done so."

Is the right of suffrage a personal and fundamental right like that of being secured against deprivation of life, liberty or property without due process of law which should be understood to be in force in Porto Rico in the manner prescribed by the said constitutional amendment, or is it one of those rights, like that of trial by jury, that apply only when expressly extended to this Island by Congress or enacted by the Legislature of the territory?

In our opinion, whatever may have been or may continue to be the personal opinion of some of the justices of this court, that is the criterion that should be adopted in settling the question involved in these mandamus proceedings. And in applying it we are compelled to hold that the right of suffrage is not a personal and fundamental right and, therefore, that the amendment as framed is not in force in Porto Rico.

The Supreme Court of the United States expressed itself as follows in the case of *Downes* v. *Bidwell, supra:*

"We suggest, without intending to decide, that there may be a distinction between certain natural rights, enforced in the Constitution by prohibitions against interference with them, and what may be termed artificial or remedial rights, which are peculiar to our own system of jurisprudence. Of the former class are the rights to one's own religious opinion and to a public expression of them, or, as sometimes said, to worship God according to the dictates of one's own conscience; the right to personal liberty and individual property; to freedom of speech and of the press; to free access to courts of justice, to due process of law and to an equal protection of the laws; to immunities from unreasonable searches and seizures, as well as cruel and unusual punishments; and to such other immunities as are indispensable to a free government. Of the latter class are the rights to citizenship, to suffrage, *Minor* v. *Happersett,* 21 Wall. 162, and to the particular methods of procedure pointed out in the Constitution, which are peculiar to Anglo-Saxon jurisprudence, and some of which have already been held by the States to be unnecessary to the proper protection of individuals." 182 U. S. 244, 282.

"The right of suffrage, therefore," as said by Dr. Lieber and quoted by the Supreme Court of Indiana in *Gougar* v. *Timberlake et al.,* "is a noble right, or ought to be so; but it is not a natural right. It is a political right, to which Providence has led man in the progressive course of history." 46 N. E. 340. See also *State ex rel. Bickett* v. *Knight,* 85 S. E. 418; *Shaw* v. *City Council of Marshalltown,* 104 N. W. 1121, and *United States* v. *Antony,* 24 Fed. Cases, 830.

As the Legislature has not yet conferred upon women the right to vote in this Island, the petitions for writs of mandamus must be denied.

*Petitions denied.* ·

Justices Wolf, Aldrey, Hutchison and Franco Soto concurred.