AMERICAN SAMOA GOVERNMENT, Plaintiff

v.

FALEFATU aka FATU FA'AMAONI, Defendant

High Court of American Samoa
Trial Division

CR No. 63-89

December 5, 1990

116

Before REES, Associate Justice, and VAIVAO, Associate Judge.

Counsel: For Plaintiff, John Wilks, Assistant Attorney General
         For Defendant, Charles V. Ala'ilima

On Motion for Reconsideration of Sentence:

### I.    *Facts and Procedural History*

On August 9, 1989, Falefatu Fa'amaoni pled guilty to a single count of Sexual Abuse in the First Degree, a felony punishable by imprisonment of up to five years. The guilty plea was pursuant to an agreement whereby the Government reduced the charge from Rape, a felony punishable by imprisonment of up to fifteen years.

The Court accepted defendant's guilty plea to the lesser charge and ordered a pre-sentence investigation. The facts contained in the pre-sentence report, which defendant did not contest either prior to sentencing or in connection with the present motion, reveal a sexual assault on a thirteen-year-old girl by Mr. Fa'amaoni (hereinafter "defendant") and two other adult males. Defendant, who was then twenty years old, appears to have been the ringleader. The probation officer who conducted the pre-sentence investigation noted that the victim

suffered both physically and mentally. . . .She sustained bruises and scratches on her body. She reported having nightmares and is seeing a psychiatrist for therapy. She expressed fear for herself and wants the court to keep Defendants as far away from her as possible.

The pre-sentence investigator added that "[t]here is also concern for Defendant[']s welfare because of victim's father and family who have vowed revenge." He noted that defendant Fa'amaoni has been in trouble before, has a serious alcohol problem, and currently lives with his alcoholic father and generally absent mother in a situation that seems calculated to exacerbate these problems. The probation officer concluded that defendant "definitely needs help" and that "[t]he problem is again his home and the lack of authority it exerts." He also recommended that sentence be calculated to give the victim and her family a "lengthy separation" from defendant.

The sentence recommended by the probation officer was substantially identical to that subsequently pronounced by the Court. Defendant was sentenced to serve five years in the Correctional Facility, with execution of sentence suspended and the defendant placed on probation for five years on condition that the defendant:

(1)     actually serve a twenty-month period of detention in the correctional facility, not to be released during this time for any reason other than medical emergencies;

(2)     upon the conclusion of the detention period, depart American Samoa for the remainder of the five-year probationary period;

(3)     participate in alcohol counseling programs;

(4)     consume no alcoholic beverages;

(5)     have no contact with the victim or her family; and

(6)     be a law abiding citizen.

Defendant now moves for reconsideration of his sentence. The motion for reconsideration was made some 99 days after the announcement of sentence. Although A.S.C.A. § 46.2402(a) provides that "a motion for new trial shall be filed within 10 days after the announcement of judgment or sentence," defendant relies on the provision of Rule 35 of the Trial Court Rules of Criminal Procedure to the effect that "[t]he Court may correct an illegal sentence at any time."

118

Defendant argues that the first two conditions of his probation are illegal. These are the conditions that he serve twenty months of probationary detention with no release except for medical emergencies and that he then depart the Territory for the remainder of the probationary period.

With respect to the condition that defendant depart the Territory for the latter part of his probationary period, the following facts are relevant: Defendant is a citizen of Western Samoa. He was born in the village of Lepa on the island of Upolu, Western Samoa, and both of his parents are Western Samoans. Defendant came to the Territory in 1974 or 1975 when his parents moved here, apparently for the purpose of employment. In 1988 defendant was detained by the police in connection with an alleged disturbance of the peace and an ensuing fight. No charges were filed, however, because defendant instead returned to Western Samoa at the request of the sa'o of the extended family with whom defendant and his family had been living in American Samoa. A few months later, however, he returned to American Samoa. Shortly thereafter he committed the crime that gave rise to the present case.

## II. *Jurisdiction*

At the outset, we note an apparent conflict between A.S.C.A. § 46.2402 and T.C.R.Cr.P. Rule 35.

The former provision, governing prerequisites to appeal in criminal cases, requires in pertinent part that "a motion for a new trial shall be filed within 10 days after the announcement of judgment *or sentence.*" A.S.C.A. § 46.2402(a) (emphasis added). The ten-day time limit set forth in this section and in its civil counterpart, A.S.C.A. § 43.0802, is mandatory and jurisdictional; errors of law not raised within ten days of judgment or sentence are waived, at least insofar as concerns the right to appeal. *See, e.g., Taulaga v. Patea*, AP No. 19-89 (Opinion and Order issued November 2, 1990); *Kim v. Star-Kist Samoa, Inc.*, 8 A.S.R.2d 146 (1988); *Government of American Samoa v. King*, AP No. 19-1970; *Judicial Memorandum No. 2-87*, 4 A.S.R.2d 172 (1987). The formal style of the motion --- for new trial, reconsideration, amendment of judgment, arrest of judgment, vacation of sentence, etc. --- has never been held essential to fulfilment of the statutory requirement. Nor is it essential that the motion specifically request a new trial rather than some lesser or different form of relief from the judgment or sentence, provided that the errors asserted by the motion are susceptible of such relief. What is essential is that some motion be filed within the statutory period

119

which fully apprises the Court of the asserted errors in the judgment or sentence, so that the trial court may consider for itself whether any such errors occurred and make appropriate corrections, thereby obviating unnecessary appeals. *See, e.g., Taulaga v. Patea, supra; Kim v. Star-Kist Samoa, Inc., supra,* 8 A.S.R.2d at 146-47; *Government of American Samoa v. King, supra; Judicial Memorandum No. 2-87, supra.*

Insofar as the cited provision of Rule 35 purports to extend or abolish the mandatory deadline for alleging errors of law in a criminal sentence, it is in direct conflict with the statute. In cases of such conflict the statute, enacted pursuant to the power of the Fono to define and reasonably restrict the jurisdiction of the High Court, must prevail over the judge-made rule. *Cf. Vessel Fijian Swift v. Trial Division,* 4 A.S.R. 983 (1975); *Fanene v. Government of American Samoa,* 4 A.S.R. 957 (1968).[1]

Rule 35 was imported almost verbatim from the Federal Rules of Criminal Procedure. This is one of a number of instances in which it appears that the committee that compiled the American Samoa rules did not notice a difference between the federal and territorial statutory schemes which may render such verbatim importation inappropriate or impossible. The federal equivalent of Rule 35 is appropriate in the federal system because the federal courts are not subject to the jurisdictional limitation imposed on the High Court of American Samoa by A.S.C.A. § 46.2402(a). There is no federal statutory requirement that a motion to reconsider a sentence be made within a certain number of days; rather, the federal rule itself, having been approved by Congress, defines the jurisdiction of the federal district courts with respect to reconsideration of sentences. In contrast, the American Samoa rules were promulgated on the sole authority of the Court and must therefore give way to territorial statutes defining the Court's jurisdiction unless the statutes themselves can be shown to be unconstitutional. *See*

---

[1]     In *Fanene* the defendant argued that he had the right to appeal an allegedly unlawful sentence some six months after it had been announced, on the ground that under the Revised Constitution of American Samoa "the legislature had no power to enact C.A.S. 3.0502 [the then-applicable thirty-day time limit for appeals] or any laws governing the jurisdiction, operations or procedures of the Judiciary." 4 A.S.R. at 961. The Appellate Division rejected this contention and held that the sentence could only have been appealed within thirty days of the time it was announced. *Id.* at 964. The Appellate Division cited the ten-day motion for new trial statute, now codified as A.S.C.A. § 43.0802(a), as a further legislative restriction on the right to appeal, but found it inapplicable because it had been enacted subsequent to the date on which the judgment and sentence in the case then before the Court had been announced. *Id.* at 962-63.

*generally American Samoa Government v. Tile*, 8 A.S.R.2d 120 (1988).

In some cases --- as when an illegal sentence was pronounced on a defendant unrepresented by counsel, or when the circumstances surrounding an error of law were such as to have made it impossible for counsel to call it to the Court's attention within ten days --- a requirement such as that imposed by A.S.C.A. § 46.2402(a) might amount to an unconstitutional denial of liberty without due process of law. No such special circumstances have been shown or alleged in the present case.

This Court does, however, have continuing jurisdiction to terminate or modify the conditions of probation throughout the entire term of the probation. A.S.C.A. § 46.2205. The matters raised by the present motion, although no longer ripe for reconsideration under A.S.C.A. § 46.2402 insofar as they allege defects in the original sentence, might well inform the Court's discretion with respect to whether conditions of probation should be terminated or modified. We therefore construe the present motion as one addressed to our discretion under A.S.C.A. § 46.2205 to terminate the two conditions of probation to which the defendant objects.

## III.     *Detention as a Condition of Probation*

Defendant's objection to the condition that he actually serve twenty months in the Correctional Facility, with no release except for medical emergencies, raises exactly the same arguments that were fully considered and rejected by the Appellate Division in the recent case of *Atuatasi v. American Samoa Government*, 9 A.S.R.2d 67 (1988).

In *Atuatasi* the Court held that the 1987 amendment to A.S.C.A. § 46.2206, permitting the Court to impose detention as a condition of probation for a period equivalent to one-third of the maximum sentence of imprisonment authorized by law for the crime in question, "has given the probation statute an entirely different purpose" than that reflected in the older and more general statements of statutory purpose on which defendant now relies. 9 A.S.R.2d at 78. Defendant argues, as did the unsuccessful appellant in *Atuatasi*: (1) that probation can only be imposed where institutional confinement is not necessary for the protection of the public, and (2) that each condition of probation must be "rehabilitative" rather than "retributive." However, *Atuatasi* upheld a sentence of detention as a condition of probation which had been imposed "precisely because the trial court determined that [the defendant] posed too great a

121

danger to the community if he were eligible for work release or similar early release programs." *Id.* at 77.

The whole purpose of the 1987 amendment, as recounted at some length by the trial court in *Atuatasi*, was to ratify and extend judicial power to use probationary detention in order

> to prevent prisoners deemed especially dangerous by the sentencing judge from being released almost immediately on furloughs, work releases, unsupervised and open-ended 'work details,' and other euphemistic devices by which convictions and sentences could be effectively cancelled.

*Atuatasi v. Moaali'itele*, 8 A.S.R. 53, 57, *aff'd sub. nom. Atuatasi v. American Samoa Government*, 9 A.S.R.2d 67 (1988). Yet this is the very complaint the present defendant makes about his sentence: that it denies him access to "rehabilitative programs" by which he would be allowed "unsupervised release from the correctional facility." (Memorandum in Support of Motion for Reconsideration, p. 4.) It was precisely such forms of "rehabilitation" that the legislature gave the Court the power to control in 1987. To argue otherwise "entirely ignores the history of this enactment." *Atuatasi v. American Samoa Government*, 9 A.S.R.2d at 78.[2]

Defendant's argument also appears to rest on the erroneous assumption that no punishment which is "retributive" can also be "rehabilitative." On the contrary, we believe that allowing this defendant to come and go freely from the correctional facility --- as still appears to happen even with the most violent criminals when the conditions of their

---

[2]   In rejecting the contention that detention under A.S.C.A. § 46.2206 must be "rehabilitative" rather than "retributive," the appellate opinion in *Atuatasi* referred to the legislative history of the statute "as detailed by the court below." 9 A.S.R.2d at 78. That account of the legislative history is reported in the trial court opinion at 8 A.S.R.2d at 60-61. It includes the observation that prior to 1987

> [a] convict's access to various forms of early release depended more on having a personal relationship with some government official inside or outside the prison --- for a time it seemed that almost any official would do, and that almost every prisoner had some such relationship --- than with any formal criteria.

*Id.* at 60. The use of probationary detention in the present case, in order to deny a serious sex offender the possibility of such early and unsupervised release from incarceration, was squarely within the legislative mandate found by the trial and appellate courts in *Atuatasi*.

122

confinement are left in the sole discretion of prison officials[3] --- would neither punish nor rehabilitate. While this defendant clearly needs help, much of the help he needs is to be taught that human actions have consequences. In our judgment, imposing a moderately serious punishment (one year and eight months of actual detention) for a most serious crime is more likely to bring about a genuine change of heart in this defendant than allowing him a chance to secure early release by "playing the system." Moreover, it is especially important in our judgment that defendant have no contact during the next few years with his victim or with her family. All these goals will be better served, in our judgment, by the sentence we imposed than by a "straight" sentence of five years with no conditions.[4]

---

[3] *See, e.g., In re A Juvenile*, UTC 103186 (partial transcript of Initial Appearance, November 28, 1990), in which the following exchange took place between the Chief Justice and a man who had accompanied his minor child to a traffic appearance:

> THE COURT: Sir, what's your name?
>
> MR. TALAMOA: Paulo Talamoa.
>
> THE COURT: Aren't you supposed to be serving a court sentence at this time?
>
> MR. TALAMOA: Yes, Your Honr. I've been released on work release, Your Honor.
>
> THE COURT: Who released you on work release?
>
> MR. TALAMOA: I do not have an understanding of that, but I think it's from the Commissioner and also from the Correctional Facility.
>
> THE COURT: How long have you been on work release?
>
> MR. TALAMOA: It's not a year now.

About eighteen months before, the Chief Justice had sentenced Mr. Talamoa to serve forty years in the Correctional Facility for two counts of Murder in the Second Degree. *American Samoa Government v. Talamoa*, CR No. 80-88.

[4] Defendant's argument that no condition of probation is valid unless it will help to rehabilitate the probationer relies heavily on the fact that our probation statute, A.S.C.A. § 46.2201 et seq., is modeled after the recently repealed federal probation statute. Contrary to defendant's position, however, the federal circuit courts were unanimous in recognizing that a condition was valid under the former statute if it served the purpose of rehabilitation *or public protection. See, e.g., United States v. Stine,* 646 F.2d 839, 843 n.7 (3d Cir. 1981); *United States v. Tonry*, 605 F.2d 144, 148 (5th Cir. 1980); *United States v. Torrez-Flores*, 624 F.2d 776, 783-84 (7th Cir. 1980); *United States v. Consuelo-Gonzalez*, 521 F.2d 259, 263-64 (9th Cir. 1975). "Public protection" includes the protection of particular people from the probationer as well as the deterrence of future misconduct by the probationer himself ("specific deterrence"). *See Tonry, supra*, 605 F.2d at 148; *United States v. Abushaar*, 761 F.2d 954, 959 (3d Cir. 1985).

The only substantial disagreement among the circuits has been about whether a condition can be upheld on the sole ground that it is a form of punishment, or that it will deter others from committing offenses such as that of the defendant ("general deterrence"). *Compare Tonry, supra*, 605 F.2d at 148 *with Abushaar, supra*, 761 F.2d at 959. Some

Finally, defendant notes that *Atuatasi* "did not address the constitutional issues raised by the [probationary detention] statute." He does not, however, go on to tell us what these issues might be.

The only trace of a constitutional attack on A.S.C.A. § 46.2206 in defendant's motion or supporting memorandum is a closing observation to the effect that "[i]n the end it is impossible for an individual defendant to determine from the written law what the punishment for crime will be and what rehabilitative help he will be able to receive." This observation has very little to do with the particular statutory provision to which defendant takes exception; rather, it applies as well or nearly as well to almost any modern statutory scheme providing for the punishment of crimes. The laws of American Samoa, *without* A.S.C.A. § 46.2206, provide not only for imprisonment and fines but also for parole and probation, which may be subject to a variety of conditions, some specified in the statute, some not. The law also provides for pardons at the entire discretion of the Governor. There is no way that a person who is thinking about committing a crime can know in advance exactly which combination of these punishments and exceptions to punishments he may receive.

What everyone can know, and is entitled to know, is that if he is convicted of a class D felony he can be sentenced to serve no *more* than five years in jail and to pay no *more* than a $5000 fine. Whether a particular person will actually serve or pay *less* than these maximum amounts is subject in varying degrees to the discretion of the Court, of the Governor, of the parole board, and of the people who happen to be running the prison at the time the person is sent there. The "unpredictability factor" posed by the additional discretion given the Court by A.S.C.A. § 46.2206 is certainly no greater than that inherent

---

Ninth Circuit cases suggest a somewhat different test: that particular conditions can be designed primarily for public protection or even for general deterrence so long as all the conditions construed together should contribute to rehabilitation. *See, e.g., Consuelo-Gonzalez, supra*, at 266-67. Even the Ninth Circuit has recognized that provisions designed to rehabilitate and/or to protect the public may have an incidental punitive effect. *Higdon v. United States*, 627 F.2d 893, 898 (9th Cir. 1980).

Even prior to the 1987 amendment, therefore, conditions of probation were valid under A.S.C.A. § 46.2205 provided that they were reasonably related either to rehabilitation or to public protection, at least if the entire sentence considered as a whole was reasonably calculated to achieve both of these purposes. Since the 1987 amendment, moreover, sentencing judges are free to impose probation "precisely the opposite reasons" than the rehabilitation-related recitals contained in A.S.C.A. § 46.2203 and in the parallel provision of the former federal law. *Atuatasi, supra*, at 79.

in the pardon power, in the institution of parole, or in probation itself. Defendant had exactly the same notice at the time he committed his crime that he might receive probationary detention as that he might be sentenced to pay a fine or that he might become eligible for parole and yet not be paroled. That he could not know for sure about any of these things does not render the statutes governing them unconstitutional.[5]

### IV. Departure from the Territory as a Condition of Probation

At the conclusion of his twenty months of detention in the correctional facility, defendant is to serve the remainder of his probationary period (about three years and six months) outside the Territory. Defendant now raises a host of objections to this condition.

Many of these objections find some support in cases decided by United States courts, which have generally held that it is beyond the power of a sentencing court to order that the defendant leave the jurisdiction.[6] Such orders, however, have been a regular feature of

---

[5]    To answer a constitutional argument hinted at even more obliquely by the defendant, there is no constitutional right to rehabilitation at public expense. *Marshall v. Parker,* 470 F.2d 34, 38 (9th Cir. 1972), *aff'd* 414 U.S. 417 (1974). Nor does the enactment of statutes authorizing the creation of particular rehabilitative programs --- or, more to the present point, of opportunities for early release --- give any particular criminal a constitutionally protected "liberty interest" in being allowed to participate in them. *See Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1 (1979). Even if there were such a statutory liberty interest, it would be subject to the grant of judicial discretion contained in A.S.C.A. § 46.2205 and would entitle a convict at most to fair notice, a hearing, and perhaps a statement of the Court's reasons for sentencing him under a regime denying access to such programs. *See Greenholtz, supra,* at 15-16. The Court observed all these procedures in sentencing the present defendant.

[6]    *See, e.g., Dear Wing Jung v. United States,* 312 F.2d 73 (9th Cir. 1962); *United States v. Abushaar,* 761 F.2d 954 (3d Cir. 1985); *United States v. Hernandez,* 588 F.2d 346 (2d Cir. 1978); *Dear Wing Jung v. United States,* 312 F.2d 73 (9th Cir. 1962); *People v. Baum,* 231 N.W. 95 (Mich. 1930), 70 A.L.R. 99 (1931); *State v. Doughtie,* 74 S.E.2d 922 (N.C. 1953); *Johnson v. State,* 672 S.W.2d 621 (Tex. App. 1984). *But see United States v. Cothran,* 855 F.2d 749 (11th Cir. 1988); *United States v. Martin,* 467 F.2d 1366 (7th Cir. 1972); *State v. Collett,* 208 S.E.2d 472 (Ga. 1974); *Parrish v. State,* 355 S.E.2d 682 (Ga. App. 1987); *Cobb v. State,* 437 So. 2d 1218 (Miss. 1983). *See also* 18 U.S.C. § 3563(b)(14) (1984 provision giving federal courts the power to impose a condition of probation that the defendant "reside in a specified place or area, or refrain from residing in a specified place or area.")

criminal sentences in American Samoa for many years.[7] There are no reported judicial opinions explaining why American Samoa does not follow the majority rule in the United States; this is because the local practice does not appear to have been challenged until quite recently.[8]

We must therefore canvass the reasons adduced for the majority rule in order to decide whether these reasons are persuasive in light of the laws and social conditions in force in American Samoa.

---

[7] *See, e.g., Government of American Samoa v. Aonga,* CR No. 93-1964 (leave Territory and not return); *Government of American Samoa v. Vaoga,* CR No. 91-1964 (leave Territory and not return); *Government of American Samoa v. Patu,* CR No. 48-1966 (leave and never enter illegally again); *Government of American Samoa v. Mamoe,* CR No. 1001-74 (three years outside Territory); *Government of American Samoa v. Moamoa,* CR No. 928-73 (five years outside Territory); *Government of American Samoa v. Vatuia,* CR No. 157-75 (never return to Territory except to change planes or ships); *Government of American Samoa v. Pauli,* CR No. 138-75 (leave Territory forever); *Government of American Samoa v. Wootton,* CR No. 119-75 (one year outside Territory); *Government of American Samoa v. Ieremia,* CR No. 1081-74 (leave Territory for unstated term); *Government of American Samoa v. Leilua,* CR No. 51-81 (eighteen months outside Territory); *Government of American Samoa v. Tunu,* CR No. 39-81 (five years outside Territory); *Government of American Samoa v. Fuimaono,* CR No. 35-81 (two years outside Territory); *American Samoa v. Uiliata,* CR No. 2-86 (fifty weeks in detention, leave Territory for the remainder of five-year probation); *American Samoa Government v. Haro,* CR No. 8-87 (four years outside Territory); *American Samoa Government v. Lloyd,* CR No. 10-87 (leave the Territory after serving three years of detention and not re-enter for balance of twenty-five year sentence); *American Samoa Government v. Wong,* CR No. 86-88 (ninety days detention, depart American Samoa and not return during the remainder of five years probation); *American Samoa Government v. Tualevao,* CR No. 93-88 (two years detention, remainder of five-year probationary period outside Territory); *American Samoa Government v. Fa'atiga,* CR No. 29-89 (six months confinement, leave Territory for remainder of five-year probation); *American Samoa Government v. Lia,* CR No. 67-89 (twenty months incarceration, remainder of five year probation outside Territory). *See also Government of American Samoa v. Mata'afa,* CR No. 13-82 (reside with uncle on the island of Ta'u during three year probation period, not return to island of Tutuila without permission of Court). This list is illustrative and includes only a fraction of the cases in which such a condition has been imposed.

[8] In *American Government v. Meleisea,* CR No. 84-89, the Court sentenced the defendant to serve two years of probation outside the Territory. The defendant moved for a new trial on the ground that this part of the sentence was illegal. The Court then modified the sentence so as to eliminate the condition, basing its decision solely on the grounds that: (1) although originally charged with a felony, the defendant had been convicted only of a Class C misdemeanor for which the maximum jail term was fifteen days; and (2) defendant had already been incarcerated for more than fifteen days before posting bail. The Court stated from the bench, however, that conditions requiring probationers to spend some time outside the Territory were frequently imposed and were appropriate in some circumstances. *Id.,* Hearing on Motion for New Trial, June 14, 1989.

## A. *Cruel and Unusual Punishment*

One case, and only one, has held that a condition requiring a defendant to leave the United States is unconstitutional as "either a 'cruel and unusual' punishment or a denial of due process of law." *Dear Wing Jung v. U.S.*, 312 F.2d 73, 76 (9th Cir. 1962). The court stated that the condition was "equivalent to a 'banishment' from this country and from [appellant's] wife and children, who will presumably remain here." *Id.* The holding was announced without further analysis and without citation of precedent or of any other source tending to shed light on whether such "banishment" was forbidden by the Eighth Amendment to the United States Constitution. The Court appears to have regarded it as self-evident that the treatment afforded the appellant, apparently an alien of Chinese extraction who had been convicted of making a false statement in an immigration hearing, was outrageous and therefore unconstitutional.

As has been noted by later courts and commentators, the "cruel and unusual" part of the *Dear Wing Jung* holding is without precedent and is difficult to reconcile with the historical bases of the Eighth Amendment. *See, e.g., U.S. v. Martin*, 467 F.2d 1366, 1368 (7th Cir. 1972) (citing Gordon & Rosenfeld, Immigration Law and Procedure, at § 9.22); 21 Am.Jur.2d, Criminal Law §§ 624, 627. Indeed, far from being considered cruel and unusual at common law, "banishment and deportation to criminal colonies was a common method of punishment in England." *People v. Baum*, 231 N.W. 95, 96 (Mich. 1930); *see* Annot., 70 A.L.R. 100. Moreover, "[d]eportation of the nationals of foreign countries is a popular method of punishing undesirable aliens who commit crimes against the United States." *Baum, supra*, 231 N.W. at 96.

This last observation by the *Baum* court is important. If it were truly "cruel and unusual" to send someone back to his home country because he had committed a crime, then such a requirement should be no less unconstitutional if imposed by an executive or administrative agency than if by a court. Yet the United States Immigration and Naturalization Service regularly deports people because they have been convicted of crimes. *See* 8 U.S.C. § 1251(a)(5), (11), (14), (15), (16). So does the Attorney General of American Samoa upon the recommendation of the territorial Immigration Board. *See* A.S.C.A. § 41.0616(4), (6), (9), (10), (11), (16). Although there are, as we shall discuss, persuasive arguments that judicial "banishment" of a criminal may be importantly different than "deportation" of the same criminal by an immigration board, these arguments have more to do with the sources and limitations

127

of institutional authority than with the nature of the punishment itself. The mere fact that a person who has committed a serious crime should be required on that account to return to his own country is not, absent extraordinary circumstances, either cruel or unusual.

### B.       Other Constitutional Arguments

Much the same can be said for defendant's contention that requiring him to spend part of his probationary period outside the Territory violates his "due process rights, travel rights, and . . . . equal protection rights." Defendant provides neither analysis nor authority for these assertions; deportation of convicted criminals under the immigration laws has consistently withstood challenges on all of the grounds now raised.

### Equal Protection

Under the law of the United States, "the alien in several respects stands on an equal footing with citizens, but in others has never been conceded legal parity with the citizen." *Harisiades v. Shaughnessy*, 342 U.S. 580, 586 (1952) (footnotes omitted). Matters having to do with entering, remaining in, and leaving the country are perhaps the most important area of inequality; unlike the citizen, the alien finds himself in an "ambiguous status within the country," the continuation of which "is not his right but is a matter of permission and tolerance." *Id.* at 586-87. Thus, it is well settled that the federal government can deport an alien for committing a crime or engaging in other undesirable conduct, although a citizen who did exactly the same thing would be allowed to remain in the country. *See, e.g., Harisiades, supra; LeTourneur v. Immigration and Naturalization Service*, 538 F.2d 1368 (9th Cir. 1976); *Van Dijk v. Immigration and Naturalization Service*, 440 F.2d 798 (9th Cir. 1971). Indeed, it is now generally recognized that judicial invalidation of certain state laws discriminating against aliens has more to do with "the paramount federal power over immigration and naturalization" than with equal protection proper. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976); *see Toll v. Moreno*, 458 U.S.1 (1982); *Foley v. Connelie*, 435 U.S. 291 (1978).

American Samoa, unlike the fifty states and the other territories of the United States, is specifically excluded from the scope of the federal immigration laws and has, pursuant to authority delegated by Congress, enacted its own such laws. *See* 8 U.S.C. § 1101(13), (29), (36), (38); A.S.C.A., Title 41. Unlike a state government, which is

128

precluded by "the paramount power over immigration and naturalization" from having its own immigration laws, the government of American Samoa has the same authority --- leaving aside for the moment the question of which branch or branches of government may exercise such authority --- to discriminate between citizens and aliens as is possessed by the government of the United States. With respect to deportation for crime, the territorial government has long exercised such authority; the present deportation statute and its predecessors are similar in form and substance to the federal statute. *See* A.S.C.A. §§ 41.0616-17; 9 A.S.C. § 377 (1973 ed.); XXIV Code Amer. Samoa, 1961 ed., § 24.0247, enacted by P.L. No. 12-50 (1972); XXIV Code Amer. Samoa, 1961 ed., § 24.0117 (repealed 1972).

Assuming but not deciding that the federal equal protection clause is susceptible of any application at all to the immigration laws of American Samoa,[9] neither that provision nor any paramount interest of the federal government is offended by treating aliens differently from citizens with respect to the right to remain in the Territory after committing a crime.[10]

------

[9] American Samoa is an unorganized, unincorporated Territory not designated by Congress for eventual incorporation into the United States proper. Accordingly, the federal Constitution applies here only insofar as its tenets restate "those fundamental limitations in favor of personal rights" that are "the basis of all free government," or which have been specifically made applicable by Act of Congress. *Dorr v. United States*, 195 U.S. 138, 146 (1922); *see Macomber v. American Samoa Government*, 12 A.S.R.2d 29, 30 (1989) ("The extent to which the equal protection clause of the Fourteenth Amendment applies in the territory is unclear[.]"); *Banks v. American Samoa Government*, 4 A.S.R.2d 113, 123-28 (1987) (discussing the extent to which federal equal protection doctrine applies in American Samoa under the doctrine of *Dorr* and the other *Insular Cases*).

The Revised Constitution of American Samoa, promulgated in 1967 under the authority of the Secretary of the Interior, contains no equal protection clause.

[10] In any event, the premise of defendant's equal protection argument --- that requiring probation to be spent outside the Territory "is merely a punitive measure" which "is only used against foreign nationals" --- is incorrect. Although the imposition of such a condition on a citizen presents somewhat different constitutional, philosophical, and practical problems than in the case of an alien, this is an extraordinarily small island, and the Court has occasionally ordered a particularly troublesome or troubled convict to leave it for a while even though he was not only a resident but also a citizen.

Thus, in *American Samoa Government v. Haro*, CR No. 8-87, an American Samoan who had been raised in California and who had committed manslaughter shortly after returning to Samoa was required to spend a year of his probation in detention and the remaining four years outside the Territory; the record reflects that the Court expected him to reside with his grandmother in the United States.

For the same reasons that requiring an alien to leave the country does not deny him the equal protection of the laws, "there is no substantive due process right not to be deported." *Linnas v. Immigration and Naturalization Service*, 790 F.2d 1024, 1031 (2d Cir. 1986); *see Harisiades, supra*, 342 U.S. at 590-91. Defendant does, of course, have the right not to have his liberty denied or abridged without procedural due process, but he has not suggested any defects in the procedure by which he was sentenced. Nor can we think of any. Defendant was represented at all stages of this criminal proceeding by competent counsel. He was provided with notice and an opportunity to be heard: the pre-sentence report recommended that defendant be required to serve part of his probation outside the Territory and gave specific reasons for this recommendation. Counsel had access to the pre-sentence report before the hearing and did in fact address some aspects of the report. By means of the present motion, moreover, defendant has been afforded a second opportunity to have the Court consider *de novo* all his objections to the sentence. Due process has been satisfied.

---

In *American Samoa Government v. Satele*, CR No. 8-81, the defendant was found to have committed two homicides but to have been not guilty of murder by reason of insanity. The court accepted psychiatric testimony offered by defendant to the effect that temporary insanity had been triggered by the strains of living on a small island and by pressures imposed by the matai system. Among other conditions of defendant's release from a psychiatric hospital was that he "reside with his wife in Los Angeles, California, unless granted permission to reside elsewhere."

In *American Samoa Government v. Mata'afa*, CR No. 12-82, a young first offender who had been born on the island of Tutuila and resided there was sentenced to serve his probation with a relative on Tau, an even smaller island about sixty miles away. Although Tau is within American Samoa, it contains only a few hundred people, few modern conveniences, and almost no opportunities for employment. A condition that a probationer reside on the far larger and more cosmopolitan island of Upolu in Western Samoa would be considered far less burdensome by most Samoans.

We express no opinion on the constitutionality of the "banishments" in *Haro*, *Satele*, and *Mata'afa* other than to observe that they suggest the Court has not traditionally viewed such conditions as punishment or as a back-door way of deporting undesirable aliens. Rather, the conditions appear to have been imposed for the same reasons we imposed a similar condition on the present defendant: for the protection of the public, with particular reference to the victim and others who may have assisted in the prosecution, and to remove the defendant from an environment found to have contributed to his criminal behavior.

It is undeniable that the defendant's sentence restricts his freedom to travel, as criminal sentences tend to do. What has been called the "right to travel," however, has generally been grounded in the Privileges and Immunity Clause of the United States Constitution (art. IV, § 2) or in other provisions having to do with the peculiar inappropriateness of barriers to free passage of goods and people within a federal union. *See generally Zobel v. Williams*, 457 U.S. 55, 71-81 (1982) (O'Connor, J., concurring); *Lutz v. City of York*, 899 F.2d 255, 258-66 (3d Cir. 1990), and authorities cited therein. Perhaps the central feature of the "unorganized and unincorporated" status of American Samoa, however, is that the Territory is *not* part of the federal system and is not intended for incorporation therein.[11] This Territory has its own immigration laws, its own customs authorities, even its own tariffs on products imported from the United States. If the constitutional provisions giving rise to the "right to travel" applied in American Samoa and meant the same things here that they do in New York or Minnesota, all these laws would be unconstitutional.

Moreover, the United States Supreme Court "has often pointed out the crucial difference between the freedom to travel *internationally* and the right of *interstate* travel." *Califano v. Aznavorian*, 439 U.S. 170, 176 (1978) (emphasis added). The right to travel among the several states is a substantive constitutional right and is "virtually unqualified," but "[b]y contrast, the 'right' of international travel has been considered to be no more than an aspect of the 'liberty' protected by the Due Process Clause." International travel can therefore "be regulated within the bounds of due process." *Id.* (*quoting Califano v. Torres*, 435 U.S. 1, 4 n.6 (1978)). Insofar as we can determine, the only cases in which restrictions on international travel have been found to deny due process have involved restrictions apparently designed to restrict disfavored speech or political association. *See Aptheker v. Secretary of State*, 378 U.S. 500 (1964); *Kent v. Dulles*, 357 U.S. 116 (1958). No such values are implicated here.

---

[11] See note 9, *supra*, and authorities cited therein. *Cf. Barnard v. Thorsten*, 489 U.S. 546, 552 (1989), holding the Privileges and Immunities Clause applicable to the Virgin Islands not because it applies of its own force in territories and possessions of the United States, but because "Congress has made [the clause] applicable to the Virgin Islands in the Revised Organic Act." American Samoa has no organic act.

Finally and most importantly, the freedom to travel is perhaps the most obvious of the freedoms a person is liable to lose when he is convicted of committing a crime. It would not be an unconstitutional abridgement of a convict's right to travel if he should be sentenced to serve five years in a penitentiary that happened to be outside the Territory. *Olim v. Wakinekona*, 461 U.S. 238 (1983). Nor, as we have observed, would it violate such a right if the immigration authorities were to deport him immediately upon his release from prison and forbid him ever to return. *Harisiades, supra.* A fortiori, a requirement that a convict spend part or all of his probation outside the Territory does not unconstitutionally abridge any such right. *Cf. Bagley v. Harvey*, 718 F.2d 921, 924-25 (9th Cir. 1983):

> There can be no doubt that [defendant's] right to interstate travel was extinguished upon his valid convictions and imprisonment. . . . Since parole in a foreign state is clearly less punitive than imprisonment in a foreign state, it cannot be deemed unconstitutional.

*See also People v. Ison*, 346 N.W.2d 894, 896 (Mich. App. 1984) (citations omitted):

> A criminal conviction constitutionally deprives the defendant of much of his liberty; convicts retain some constitutional rights, but those rights are subject to restrictions imposed by the nature of the regime to which they have been lawfully committed. . . .A probationer retains only those rights which are consistent with his probationary status. . . .A condition of probation restricting the probationer's right to travel may therefore be imposed without violation of the constitution.

In sum, the problem with "judicial banishment" is clearly not that it violates an individual right of the convict to remain in the jurisdiction where he committed his crime. Rather, the problems found by United States courts have had to do with federalism and with the allocation of powers among the co-ordinate branches of government.

132

State courts are agencies of state governments, which have no power to regulate interstate or international immigration.  Neither a state court nor any other state agency can require people to leave the country, because the Constitution commits exclusive power over international relations to the federal government.  Nor can such an agency require people to leave the state, because open interstate borders are deemed an essential element of the federal union ordained by the Constitution:

> The American states are not supreme, independent, sovereign states in relation to those things delegated by the people to the federal government, though the states are all in the Union on the basis of equality of political rights.  Independent national states have a right to protect their political institutions, their people, and their independent existence by excluding legally and forcibly undesirable foreigners.  This is the basis of the laws of the United States restricting immigration.  To permit one state to dump its convict criminals into another would entitle the state believing itself injured thereby to exercise its police and military power, in the interest of its own peace, safety, and welfare, to repel such an invasion.  It would tend to incite dissention, provoke retaliation, and disturb that fundamental equality of political rights among the several States which is the basis of the Union itself.

*Baum, supra*, 231 N.W. at 96.

Although American Samoa is not supreme, independent, or sovereign, it does bear a different relation to the federal union than do the several states of that union.  Some aspects of this relationship would appear disadvantageous: for instance, American Samoans have no voice in the election of the President or of voting members of Congress, cannot generally travel to the United States without passports, and may be required to pay United States customs duties on goods they bring into the United States.  In other respects this unique relationship permits governmental institutions in American Samoa to do things that cannot be done by equivalent institutions of state government.  Thus, for example, the High Court of American Samoa, like the federal courts of the United States but unlike any state court, has admiralty jurisdiction; the territorial

Senate is a council of chiefs selected by traditional processes rather than by direct popular election; and, as we have already observed, the territorial government can and does regulate immigration and travel, not only between American Samoa and the United States but also between American Samoa and foreign nations.

With respect to questions having to do with travel in and out of the jurisdiction, therefore, the High Court of American Samoa is not in the position of a state court. This Court is an agency of a government which *does* have the power to "exclud[e] legally and forcibly undesirable foreigners." *Baum, supra,* 231 N.W. at 96. In this respect the High Court is analogous to a federal court.

There appears to be no constitutional obstacle to an order by a federal court that probation be served outside the jurisdiction in which the crime was committed, and federal statutes clearly contemplate such orders.[12] In *Bagley, supra,* a federal parolee was required to move from Washington to Iowa, apparently because he had threatened his former wife and the witnesses at his trial. In *United States v. Cothran,* 855 F.2d 749 (11th Cir. 1988), the court of appeals held that a federal district court had not abused its discretion by requiring a probationer who had "frequent[ed] many high crime areas" in his home county to remain outside the county for two years unless permitted by his probation officer to return.[13]

Federal court orders that a probationer remain outside the United States during the term of probation, however, have been held to be outside the scope of judicial authority. *United States v. Jalilian,* 896

---

[12]    *See* 18 U.S.C. § 3563(b)(14) (court may require a probationer to "reside in a specified place or area, or refrain from residing in a specified place or area"); *id.* § 3605 ("A court, after imposing a sentence, may transfer jurisdiction over a probationer . . . to the district court for any other district to which the person is required to proceed as a condition of his probation or release . . . ."). *Cf.* 28 C.F.R. § 2.33(b) (a parolee should be released to the place of his residence "unless . . . another place of residence will serve the public interest more effectively or will improve the probability of the applicant's readjustment.").

[13]    *See also Alonzo v. Rozanski,* 808 F.2d 637 (7th Cir. 1986), upholding the refusal of a probation officer to let a paroled drug offender move to a house he had bought in Florida, where there were already too many drug offenders for probation officers to supervise. "Alonzo's control of abode was extinguished, for the entire term of his sentence, by the judgment of conviction." *Id.* at 638. In *Rizzo v. Terenzi,* 619 F.Supp. 1186 (E.D.N.Y. 1985) (upholding the refusal by another probation officer to allow another convicted drug importer to visit his family home in Florida).

F.2d 447 (10th Cir. 1990); *United States v. Abushaar*, 761 F.2d 954 (3d Cir. 1985); *United States v. Hernandez*, 588 F.2d 346 (2d Cir. 1978); *United States v. Castillo-Burgos*, 501 F.2d 217 (9th Cir. 1974). This is because "Congress has enacted a detailed scheme for the admission and deportation of aliens" and has "placed the Attorney General in charge." *Hernandez, supra*, at 351; *see Jalilian, supra*, at 448-49; *Castillo-Burgos, supra*, at 219-20.

The federal immigration law charges the Attorney General with the administration and enforcement of the chapter of the United States Code pertaining to immigration and also of all other laws "relating to the immigration and naturalization of aliens." *Hernandez, supra*, at 351, *quoting* 8 U.S.C. § 1103(a). Significantly, the federal statute also provides:

> In any case in which an alien is ordered deported from the United States under the provisions of this chapter, *or of any other law or treaty*, the decision of the Attorney General shall be final.

8 U.S.C. § 1252 (emphasis added). This final authority of the Attorney General would appear to apply even when someone has been ordered to leave the country under an "other law or treaty" not specifically pertaining to immigration or naturalization. If, therefore, a federal court order that a probationer leave the country should be regarded as a lawful exercise of judicial authority under the probation statute, the order might then be subject to review and possible veto by the Attorney General under 8 U.S.C. § 1252. This scenario "raises difficult questions about possible conflicts between judicial independence and the Attorney General's final authority under section 1252" and therefore "suggests that the probation statute . . . should not be read to authorize de facto deportation orders." *Jalilian, supra*, at 448-49.

It is important to notice that the exclusive power of the Attorney General over admission and deportation of aliens, although sometimes described in terms of "separation of powers," is a matter of statutory interpretation rather than constitutional command. The federal cases do not stand for the proposition that there is anything inherently "executive" rather than "judicial" about ordering a convicted criminal to leave the country. On the contrary, "Congress might have given the courts a role in determining deportability" but "chose not to." *Hernandez, supra*, at 351.

The federal decisions, with the exception of *Dear Wing Jung*, also seem to recognize that in the absence of a pre-emptive commitment of exclusive power to another branch, an order that a probationer move from the scene of his crime to the place of his birth and citizenship would at least sometimes be within the general authority of courts to grant probation "upon such terms and conditions as the court deems best." 18 U.S.C. § 3651, *quoted in United States v. Martin*, 467 F.2d 1366, 1368 n.4 (7th Cir. 1972); *see also Hernandez, supra*, at 351-52.[14] Indeed, federal appellate courts have sometimes upheld conditions of probation that required the probationer to leave the country "voluntarily" in exchange for a suspension of part or all of the sentence, provided that the probationer is not barred from re-entering the country during the probation period with the permission of the immigration authorities. *Martin, supra; United States v. Janko*, 865 F.2d 1246 (11th Cir. 1989); *see United States v. Mercedes-Mercedes*, 851 F.2d 529 (1st Cir. 1988) (court could forbid alien probationer who had left the country from re-entering without permission of the "pertinent legal authorities" but could not give the probation officer a veto power over such re-entry). Moreover, the judicial power over probation has generally been found broad enough to validate conditions that were quite onerous and quite restrictive of what would otherwise have been the probationer's rights under other laws, provided that such conditions were reasonably calculated either to rehabilitate the defendant or to protect the public. *See, e.g., United States v. Tonry*, 605 F.2d 144 (5th Cir. 1979) (probationer barred from being a candidate for public office); *United States v. Tolla*, 781 F.2d 29 (2d Cir. 1986) (probationer barred from teaching religion to young people).

The decisions holding that this otherwise broad power stops at the water's edge have relied not only on the explicit language of the federal immigration statutes, but also on a long and unbroken tradition that the power to expel aliens is "a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Jalilian, supra*, at 448 (quoting *Fiallo v. Bell*,

---

[14]    18 U.S.C. § 3651 has recently been repealed and replaced by 18 U.S.C. § 3563, quoted in note 12 *supra*, which explicitly gives courts the power to require probationers to reside in or outside of particular places. However, in *Jalilian, supra*, the Tenth Circuit held that even this language should not be read as a grant of power to require a probationer to leave the country. As discussed in the text *supra*, this holding rested not on the language of the new probation statute itself, but on the possibility that "de facto deportation orders" might be reviewable by the Attorney General and thus raise questions about the independence of the judiciary. *Id*. at 448-49.

430 U.S. 787, 792 (1977)); *see Hernandez, supra*, at 351. This tradition, in turn, has to do with the relationship of immigration policy to "our foreign relations and the national security." *Galvan v. Press*, 347 U.S. 522, 530 (1954). Indeed,

> any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.

*Harisiades, supra*, 342 U.S. at 588-89.

The situation of American Samoa differs from that of the United States in two important respects. In the first place, there is no equivalent in our immigration statutes to 8 U.S.C. § 1252, the provision giving the Attorney General power to review deportation orders even when they arise under "other laws and treaties" not directly concerning immigration or naturalization. The territorial immigration statute does give the Attorney General power to "enforce and administer" those laws that do pertain to immigration and to the status of aliens, and also provides that the procedures set forth therein shall be the exclusive method for "determining the deportability of any person *under this chapter*." A.S.C.A. §§ 41.0103(a), 41.0614 (emphasis added). The territorial statute is altogether silent about whether anyone might ever be required to leave the Territory as a result of a procedure authorized implicitly or explicitly by some other statute. It is far from clear that the Attorney General's power to administer those laws pertaining directly to immigration should be read to limit any power the courts would otherwise have to grant probation subject to reasonable conditions as authorized by A.S.C.A. § 46.2205.

Moreover, the tradition here with respect to judicial involvement in immigration matters is quite different than the tradition in the United States. The High Court of American Samoa has frequently imposed residence outside the Territory as a condition of probation or suspension of sentence at least since 1964 --- before the enactment of the present

137

immigration code or its immediate predecessor and before the promulgation of the territorial constitution.[15]

This difference between the historic allocation of authority among the co-ordinate branches of government in American Samoa and among their counterpart institutions in the United States may reflect a recognition that the territorial immigration laws have far more to do with domestic policy than with international relations. The concerns that gave rise to the tradition of exclusive control by the political branches in the United States, having to do with treaties and wars and insurrections, do not weigh heavily here; although the Territory has its own customs and immigration laws, its foreign relations generally are conducted by the government of the United States.

The sole stated purpose of the territorial immigration statute is to preserve the "limited land resources, water, sewage facilities, and educational and economic opportunities" on the seventy-six square miles that comprise American Samoa. A.S.C.A. § 41.0201. Whether the admission, exclusion, or deportation of a particular person would suit this purpose is a policy judgment left in large measure to the discretion of the executive branch. Court orders with respect to probation are designed to realize a different and substantially unrelated set of policies: the protection of the public and the rehabilitation of offenders. The Court has neither competence nor interest in second-guessing the judgment of the immigration authorities on whether the presence of a particular person represents an efficient allocation of economic resources. The sentencing judge is, however, uniquely well-situated to know whether a particular offender needs to be insulated from his past environment, his associates, his victim, or those who assisted in his prosecution and how, under the particular circumstances of his case, best to assure such insulation.

The executive power to deport "undesirables" and the judicial authority over probationers differ markedly not only in purpose but also in scope. Persons deemed deportable under the immigration statute are almost invariably deemed excludable from readmission. *See* A.S.C.A. §§ 41.0615-41.0616. Such persons may, however, in many

---

[15] We do not know just when the practice began, because the records of our criminal cases before the mid-1960s are practically nonexistent. The presiding judge in the two 1964 cases was Chief Justice Morrow, who had held that office since 1937; to say that a practice or procedure in the High Court of American Samoa dates back to Morrow is to say that the memory of man runs not to the contrary.

circumstances be readmitted at the discretion of the Immigration Board and the Attorney General. *See, e.g.*, A.S.C.A. §§ 41.0613, 41.0617. The practical result is that the Attorney General often has discretion to deport someone and keep him out for life. The Court's power over probationers, in contrast, is strictly limited to the term of the probation, which may not exceed five years. A.S.C.A. § 46.2204. At the end of this time the probationer may be readmitted by the Immigration Board and the Attorney General whether or not the Court considers readmission to be a good idea.

There is, in other words, no necessary conflict between the two statutory schemes relating to probation and to immigration, although they may sometimes generate similar results. The very worst that can be said is that some probation orders might seek to reform an offender or to protect his victims at the expense of what would otherwise be considered an optimal allocation of water, sewage facilities, or educational opportunity; or that some administrative deportation orders might seek to conserve such resources by ridding the Territory of convicts who, from the standpoint of rehabilitation and public protection, might just as well be allowed to stay. These risks are a far cry from the spectre of interference with "foreign relations, the war power, and the maintenance of the republican form of government." *Harisiades, supra*, 342 U.S. at 588.

In any event, the judiciary has exercised this facet of the probation power for a period spanning at least ten Chief Justices, even more Attorneys General, and any number of Legislatures. Its exercise has had but little quantitative effect on immigration policy taken as a whole, but has figured importantly in the administration of justice. In American Samoa, as in the United States, "the slate is not clean." *Galvan v. Press, supra*, 347 U.S. at 531.

Since 1964 the Fono has substantially revised and/or recodified the immigration statutes on at least eight occasions. Act of 10 Jan 1972, P.L. No. 12-50; Immigration Act of 1984, P.L. No. 18-52; P.L. No. 10-65 (1968); P.L. No. 11-58 (1969); American Samoa Criminal Justice Act of 1979, P.L. No. 16-43 § 2 (1979); P.L. No. 18-16 § 1 (1983); P.L. No. 20-15 § 1 (1987); P.L. No. 20-56 (1988). It would be fatuous to suppose that the members of the Fono have been unaware during all this time of the frequent and open resort by the judiciary to conditions of probation such as the one to which defendant now objects. Had the Fono disapproved of this long-standing judicial application of the probation statute (or of the equally obvious practical construction of the

139

immigration statute as imposing no restriction on judicial power to prescribe the conditions of probation), it had the power to abolish the practice by statute. On the contrary, however, the only legislative actions that can be construed as expressing legislative approval or disapproval of judicial policy with respect to probation were the 1983 and 1987 amendments to A.S.C.A. § 46.2206. These amendments sought explicitly to *increase* the flexibility afforded the judiciary with respect to probation, and implicitly abolished any previous requirement that terms of probation be designed exclusively to rehabilitate. *See Atuatasi*, *supra*, 9 A.S.R.2d at 78.

Legislative inaction in such circumstances strongly suggests agreement with, or at least acquiescence in, the judicial interpretation of the laws in question. *See Bob Jones University v. United States*, 461 U.S. 574, 600-01 (1983). When the legislature re-enacts a statute or adopts amendments to it "without a suggestion of disagreement" with a prior judicial construction, there is an even stronger presumption that the legislature has adopted the prior construction. *Union Electric Co. v. Illinois Commerce Commission*, 396 N.E.2d 510, 518 (Ill. 1979); *see Merrill Lynch Pierce Fenner & Smith v. Curran*, 456 U.S. 353, 382 n.66 (1982), and authorities cited therein; 2A Sutherland Statutory Const. §§ 49.03-05, 49.09-10 (4th ed. 1984).

The practical construction long placed on the American Samoa probation and immigration statutes,[16] together with the Fono's conspicuous failure for least a quarter of a century to restrain the Court from imposing conditions like the one now at issue, convince us that such conditions encroach neither upon the legislative power to prescribe punishment nor upon the powers delegated to the executive branch by the immigration statute.

### D.      Public Policy

Having determined that the disputed condition of defendant's probation is neither unconstitutional nor prohibited by law, we are left to decide whether such a condition is a reasonable exercise of our probation power.

---

[16]      It is a measure of the breadth of the consensus behind this construction that the Attorney General, whose power the defendant says we are usurping, has frequently recommended that the Court require convicts to spend part or all of their probationary period outside the Territory.

The reported opinions rejecting "judicial banishment" as a sentencing option seem to have been motivated not so much by the specific constitutional and statutory arguments raised therein as by related questions of public policy. Some courts have gone so far as to lay down a rule that it is always contrary to public policy for one jurisdiction to "dump" a convict on another. *See, e.g., State v. Doughtie*, 74 S.E.2d 922 (N.C. 1953); *Johnson v. State*, 672 S.W.2d 621 (Tex. App. 1984). The forcefulness with which this rule is stated tends to vary inversely with the analysis offered in its support; in most cases the court simply invokes a term such as "dumping" or "banishment" and considers the point won. *See, e.g., Dear Wong Jung, supra; Johnson, supra.* In other cases, however, the anti-dumping rule has been explained by reference to three main arguments:

1) That requiring a person to leave or stay out of the state is inconsistent with federalism. This concern was best articulated by the Michigan court in *Baum, supra,* discussed in Part IV(C) of the present opinion.

2) That such a condition cannot be consistent with rehabilitation, since the Court cannot supervise the probationer once he is outside the Court's jurisdiction, and cannot be consistent with public protection, since the probationer is no less likely to commit crimes in one jurisdiction than in another. *See Abushaar, supra,* at 761 F.2d at 959-60, and authorities cited therein.

3) That "banishment," although perhaps not a cruel and unusual punishment within the meaning of the Constitution, is nevertheless a harsh one. "Through the ages the lot of the exile has been hard." *Doughtie, supra,* 74 S.E.2d at 924; *see Abushaar, supra,* 761 F.2d at 959.

For reasons we have discussed, federalism is not a major concern in American Samoa. It is not a concern at all in the present case, since the defendant would appear ineligible for admission into the United States (*see* 8 U.S.C. § 1182(a)(9)) and will presumably return to his native Western Samoa.

The remaining arguments are not without force, but they state only one side of the case and they depend heavily on the circumstances.

One of the most important circumstances of the present case is that the defendant chose to commit his crime in a tiny jurisdiction in

141

which, if neither incarcerated nor "banished," he is virtually certain to have frequent chance encounters with his terrified fourteen-year-old victim and with members of her family. The condition that defendant leave the Territory was imposed by the Court primarily in the belief that the young victim of this crime is entitled to a longer respite from contact with the defendant than can be afforded by the twenty-month detention period. This concern is manifestly related to public protection, at least in light of the pre-sentence investigator's findings about the victim's mental state. Although it is always possible that the defendant could commit another crime no matter where he might be, our primary concern at the time of sentencing was that the defendant would do further harm to his victim in American Samoa, whether or not he should commit another crime.

Nor is it always true that a condition can have no rehabilitative effect simply because it will not be administered by a probation officer. In this case it was deemed important for the defendant's own good to insulate him from contact with the victim's family and with his companions in crime.

Finally, the Court was of the opinion that a sojourn in his native village in Western Samoa might expose the defendant to a system of values more wholesome, and of social controls more effective, than those at work in his previous environment. Western Samoa is a more traditional country than American Samoa; it is more difficult there for a young man to avoid the demands of the extended family, church, and matai system, as the present defendant has been able to do thus far. His home life in the village of Fagatogo prior to his incarceration was almost certainly a major contributing factor to his alcoholism and to his related criminal conduct. We infer from the pre-sentence report that there are several extended families, if not in his native village of Lepa then elsewhere in Western Samoa, with whom defendant has a traditional right to live in exchange for service, obedience, and good conduct. We can do far more good for him by maximizing the likelihood that he will be exposed to a system that inculcates these virtues than by letting him resume his former life in Fagatogo subject to the requirement that he meet with a probation officer once a month.

Recent cases have recognized that rehabilitation may sometimes be served by keeping a person away from the environment that contributed to his crime --- and that putting some distance between the criminal and his victim may be justified as reasonably related to public protection. Thus, in *Cothran*, *supra*, a probationer was required to stay

142

out of his home county, which includes Atlanta, because his presence in certain criminal haunts in that city had contributed to his criminal behavior. In *Bagley, supra*, the court upheld a decision by parole authorities to require a parolee who had threatened his former wife and certain witnesses against him to move from Washington to Iowa. In *Cobb v. State*, 437 So. 2d 1218 (Miss. 1983), the probationer was required to stay 125 miles away from his home county for a period of five years; the defendant had been convicted of an aggravated assault upon a relative who lived three-eighths of a mile away from him, and the court found this proximity to be a likely source of further trouble among the relatives. *See also State v. Collett*, 208 S.E.2d 472 (Ga. 1974) (probationer required to remain outside seven-county area); *Parrish v. State*, 355 S.E.2d 682, 684 (Ga. App. 1987) (banishment of probationer from the judicial circuit upheld as "prompted by a rational concern for the safety of others in the community and for defendant's own safety"). The 1984 amendment to the federal probation statute, 18 U.S.C. § 3563(b)(14), also specifically recognizes that such conditions can be reasonably related to the purposes of probation.

A requirement that a probationer live outside American Samoa is equivalent in many ways to a requirement that he live outside a particular township or a very small county in the United States. The practical effect of the order in the present case is that the defendant will almost certainly reside sixty miles away on his native island of Upolu. Although there is an international border between Upolu and the adjacent island of Tutuila, the two islands share a common language, history, and culture. Our order that the defendant move from the relatively large, modern, and quasi-urban village of Fagatogo to Lepa or some other village in Western Samoa is calculated to achieve roughly the same effects as the requirement that the defendant in *Cothran* move from Atlanta to a neighboring rural or suburban county.[17]

---

[17] Although it was and is our intention that defendant should go to live with his extended family in Lepa or in some similar village, our order does not strictly require this. Rather, the defendant is effectively given the run of Western Samoa, which includes over three-fourths of the population and nine-tenths of the land area of Samoa. It is even theoretically possible, although most unlikely, that he could find some other country willing to permit residency by a non-citizen recently convicted of a felony. In this respect our order is similar to the one in *Cothran*, which excluded the defendant from the county that included Atlanta but not from every other place in which he might find similar criminal opportunities. As the Eleventh Circuit observed in *Cothran*, the mere possibility that the defendant might replicate in another place the kind of life he had in the place from which the probation order excludes him does not render the order invalid. Rather, "such remarks merely invite the court to question whether [the] present sentence is too lenient." *Cothran*,

Nor (although this would not necessarily be dispositive) can we discern that the condition will bring about any important changes in defendant's immigration status. He would presently appear to be deportable under A.S.C.A. § 41.0617(4) as a person who has been "convicted of a crime involving moral turpitude committed within 5 years after any entry," and if he were out of the Territory he would be excludable as a convicted felon under A.S.C.A. § 41.0615(8). In either event the Attorney General may have discretion to allow him to return and/or remain. *See* A.S.C.A. § 41.0617. Any other practical effects on defendant's life are likely to be wholly salutary.

We conclude that the condition that defendant reside outside the Territory during part of his probation is not unduly harsh and is reasonably related to the purposes of probation. We therefore decline to revoke the condition.

### V. Conclusion and Order

Insofar as the motion is intended as a motion for new trial under A.S.C.A. § 46.2402(a) or is intended to be in lieu of such a motion, it is denied for want of jurisdiction.

Insofar as the motion is addressed to our discretion under A.S.C.A. § 46.2205 to revoke or modify the conditions of probation at any time during the period of probation, it is denied on the merits.

It is so ordered.

---

855 F.2d at 753. We would consider modifying our order to require residence in a particular village should either the Government or the defendant so move.